FILED

FEB 15 2013

CLERK. U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

~~SEALED~~

CASE UNSEALED
2/21/13 KCM

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> JOSE ISIDRO RODRIGUEZ-LARA (1), <br> DAVID AGUILAR (2), <br> ALMA JAIME (3), <br> MANUEL MARCIAL (4), <br> FELIPE GARCIA-GALLEGOS (5), <br>   aka Martin, <br> GUADALUPE NATALIE PEREZ (6), <br> JOSE LUIS LOPEZ (7), <br>   aka Don Chepe, <br>   aka Viejo, <br> ROSALIA LOURDES NIEVES (8), <br> ALICIA REYNA MARIN (9), <br> LEONARDO GARCIA-GAYTAN (10), <br> NANCY BLANCAS-PENA (11), <br> SYLVIA SANCHEZ-ZARATE (12), <br> SYLVIA LARA (13), <br> JULIO CESAR RODRIGUEZ-ZARATE (14), <br> MIGUEL GUTIERREZ-MARANTES (15), <br> JOSE JUAN MANCILLA-MONJE (16), <br> EDSON SOLIS-VALDOVINOS (17), <br> NATHAN KAHAKULANI YASSO (18), <br> HERNAN SEBASTIAN BERNAL (19), <br><br> Defendants. | Magistrate Case No. <br><br> **'13MJ0608** <br><br> COMPLAINT FOR VIOLATION OF: <br><br> Title 21, U.S.C., Sections 841(a)(1), 846 <br><br> Conspiracy to Distribute Controlled Substances |

The undersigned complainant, being duly sworn, states:

Beginning at a date unknown and continuing up to and including February 13, 2013, within the Southern District of California, and elsewhere, defendants JOSE ISIDRO RODRIGUEZ-LARA, DAVID AGUILAR, ALMA JAIME, MANUEL MARCIAL, FELIPE GARCIA-GALLEGOS, aka Martin, GUADALUPE NATALIE PEREZ, JOSE LUIS LOPEZ, aka Don Chepe, aka Viejo, ROSALIA

LOURDES NIEVES, ALICIA REYNA MARIN, LEONARDO GARCIA-GAYTAN, NANCY BLANCAS-PENA, SYLVIA SANCHEZ-ZARATE, SYLVIA LARA, JULIO CESAR RODRIGUEZ-ZARATE, MIGUEL GUTIERREZ-MARANTES, JOSE JUAN MANCILLA-MONJE, EDSON SOLIS-VALDOVINOS, NATHAN KAHAKULANI YASSO, and HERNAN SEBASTIAN BERNAL, did knowingly and intentionally conspire with each other and with other persons known and unknown to distribute controlled substances, to wit: 50 grams and more of methamphetamine (actual), and five (5) kilograms and more of cocaine, Schedule II Controlled Substances; in violation of Title 21, United States Code, Sections 846 and 841(a)(1).

And the complainant further states that this complaint is based on the attached statement of facts, which is incorporated herein by reference.

JEFFREY A. WIGHT
Special Agent
Drug Enforcement Administration

SWORN TO BEFORE ME AND SUBSCRIBED IN MY PRESENCE, THIS 5TH DAY OF FEBRUARY 2013.

HONORABLE DAVID H. BARTICK
UNITED STATES MAGISTRATE JUDGE

**AFFIDAVIT IN SUPPORT OF APPLICATION**

I, JEFFREY A. WIGHT, being first duly sworn, state under oath as follows:

**I**

**INTRODUCTION**

1.    I am a Special Agent Criminal Investigator for the United States Drug Enforcement Administration (DEA), and I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 of the United States Code. I am empowered by law to conduct investigations and to make arrests for felony offenses.    I was hired by the DEA in October of 2000, and I attended the DEA academy for approximately sixteen (16) weeks.    At the DEA Academy, I was trained in all aspects of conducting narcotics investigations.    In February 2001, I was sworn as a DEA Special Agent and was assigned to DEA Riverside District Office's Enforcement Group 1.    This enforcement group primarily investigated illegal drug trafficking organizations operating in the United States, and internationally, including those organizations whose operations involve the distribution of wholesale quantities of cocaine, methamphetamine, marijuana, ecstasy and heroin in and around the Riverside, San Bernardino, and Los Angeles areas.    In October 2007, I was assigned to the DEA Cartagena, Colombia Resident Office's Colombian Pacific Coast Maritime group.    During my tenure in Cartagena, Colombia I primarily focused on the Colombian drug trafficking organizations which transported ton quantities of cocaine, heroin and marijuana from the Pacific Coast of Colombia to Central America, Mexico and the United States.    In November 2011, I was transferred to the DEA San Diego Field Division's Enforcement Group 1.

This enforcement group is part of the Federal Bureau of Investigation's Major Mexican Trafficking Task Force (MMTTF) which focuses on the Mexican Drug Cartels operating in Tijuana, Mexico and San Diego, California.

2. While with the DEA, I have participated in hundreds of drug investigations. These investigations involved: (1) unlawful importation, exportation, manufacture, possession with intent to distribute and distribution of narcotics; (2) the laundering of narcotics proceeds and monetary instruments derived from narcotics activities; and (3) conspiracies associated with narcotics offenses. These investigations have involved debriefing defendants, witnesses and informants, conducting surveillance, assisting in court ordered interceptions, executing search warrants, seizing narcotics and narcotics-related assets and making arrests for narcotics-related offenses. As such, I am aware that drug traffickers often conduct business via telephone and often use code and/or vague language to disguise their illegal activities. This training and experience forms the basis for opinions expressed below. The following is based on my own investigation, oral and written reports by other law enforcement officers, physical surveillance, interviews, database checks, phone analysis, and other investigation.

3. Based on my experience, and through extensive consultation with other agents who are experienced in conducting drug trafficking investigations, I am familiar with the methods utilized in narcotics trafficking operations, as well as the methods and means used by drug trafficking organizations to control narcotics trafficking. Specifically, I am familiar with the importation of illegal narcotics into the United States from Mexico and the transportation of narcotics

2

to centralized distribution points, such as San Diego and Los Angeles, California. Additionally, I know that once the narcotics reach their final destination cities they are distributed by wholesale dealers down to street level users often through midlevel distributors. I am also aware that drug trafficking organizations must collect and transport drug proceeds from the sale of their drugs and often these drug proceeds are transported in the form of bulk currency.

4. Through these discussions and through my own training and experience, I know that drug traffickers principally rely on cellular phones to communicate with associates and other coconspirators. The use of telephones is essential in maintaining timely long distance and local contacts with fellow drug traffickers. They often use cellular phones to coordinate the delivery of drugs and believe it is a secure method of communications. I also know that narcotics traffickers will often use fraudulent information to subscribe to communication facilities, especially cellular telephones and frequently change communications facilities in order to thwart law enforcement efforts to investigate their use of cell phones and other communications facilities.

5. Through my employment with the DEA, I have gained knowledge in the use of various investigative techniques including the utilization of physical surveillance, undercover (UC) agents, confidential sources, cooperating witnesses, the controlled purchases of illegal narcotics, electronic surveillance (GPS precision location and monitoring intercepted telephone conversations and taking law enforcement action based on intercepted conversations), consensually monitored recordings, investigative interviews, trash covers, mail

covers, financial investigations, serving Administrative and Grand Jury Subpoenas, and the execution of arrest and search warrants.

6. My experience as a law enforcement officer, my participation in the investigation of narcotics organizations, my conversations with other agents, and other state and local law enforcement officers familiar with narcotics trafficking and organized crime, as well as my training, form the basis of the opinions and conclusions set forth below, which I have drawn from the facts set forth herein. Because this affidavit is being prepared for the limited purpose of obtaining authorization for the requested complaint, arrest warrants, and search warrants, I have not set forth all of the facts known to me about this investigation, rather, the facts I believe are necessary to establish probable cause for my request. I set forth only the facts necessary to establish foundation for the requested order. Conversations and discussions included herein are set forth in substance unless otherwise noted. My interpretations of certain statements are set forth in parenthesis or brackets, and are based upon my knowledge of the investigation. Dates and times established herein are approximations.

7. I make this affidavit based upon personal knowledge derived from my participation in this investigation and from information obtained from the following sources:

a. Oral and written reports about this and other investigations which I have received from various federal and local law enforcement agencies;

b. Physical surveillance conducted by investigators, which I have participated in or was reported to me either directly or indirectly;

1         c.   Wire interceptions, Global Positioning System (GPS)

2 data, pen registers and trap and trace information, telephone toll

3 records, and subscriber information;

4         d.   Financial and public records; and/or

5         e.   Confidential informants.

6     8.   Unless otherwise noted, wherever in this affidavit I assert

7 that a statement was made, the information was provided by another law

8 enforcement officer (who may have either direct or indirect knowledge

9 of the statement) to whom I have spoken or whose report I have

10 reviewed.

11     9.   This affidavit is in support of a criminal complaint and the

12 issuance of arrests warrants and search warrants as listed below.

13                          II

14         **CRIMINAL COMPLAINT AND ARREST WARRANTS**

15     10.   I believe that probable cause exists for the issuance of a

16 criminal complaint and arrest warrants for the following individuals:

17         a.   Jose     Isidro     RODRIGUEZ-Lara    (hereinafter

18 RODRIGUEZ-Lara): an adult male born in 1970 and who resides at 1118

19 Cochise Court, Vista, CA.

20         b.   Silva ZARATE-Sanchez (hereinafter ZARATE-Sanchez): an

21 adult female, born in 1966, who resides at 1118 Cochise Court, Vista,

22 CA.

23         c.   Silva LARA (hereinafter LARA): an adult female, born in

24 1994, who resides at 1118 Cochise Court, Vista, CA.

25         d.   Guadalupe Natalie PEREZ, aka Nati (hereinafter PEREZ):

26 an adult female, born in 1990, who resides at 1118 Cochise Court,

27 Vista, CA.

28

1      e.   Felipe   de   de Jesus   GARCIA-Gallegos,   aka   Martin

2 (hereinafter GARCIA-Gallegos): an adult male, born in 1985, who

3 previously resided at 2133 N Santa Fe, Vista, CA, and currently

4 resides in Tijuana, Mexico.

5      f.   Manuel J. MARCIAL (hereinafter MARCIAL): an adult male,

6 born in 1981, who resides at 521 Concepcion Ave, Spring Valley, CA.

7      g.   Rosalia Lourdes NIEVES (hereinafter NIEVES): an adult

8 female, born in 1982, who resides at 521 Concepcion Ave, Spring

9 Valley, CA.

10      h.   David AGUILAR (hereinafter AGUILAR): an adult male,

11 born in 1981, who resides at 3668 La Mirada Drive, San Marcos, CA

12      i.   Alma JAIME, aka La Dona (hereinafter JAIME): an adult

13 female, born in 1974, who resides at 820 Sycamore Avenue, Apartment

14 #238, Vista, CA.

15      j.   Jose Luis LOPEZ, aka Don Jose, aka Don Chepe, aka El

16 Viejo (hereinafter LOPEZ): an adult male, born in 1945, who resides at

17 1145 E Barham Drive SPC 4, San Marcos, CA.

18      k.   Alicia Reyna MARIN (hereinafter MARIN): an adult

19 female, born in 1963, who resides at 4624 Maple Avenue, Oceanside, CA.

20

21      l.   Julio   Cesar   RODRIGUEZ-Zarate   (hereinafter

22 RODRIGUEZ-Zarate): an adult male, born in 1974, whose last known

23 residence is 2447 Stockton Lane, Vista, CA.

24      m.   Miguel   GUTIERREZ-Marentes   (hereinafter

25 GUTIERREZ-Marantes): an adult male, born in 1986, whose last known

26 residence is 13841 Roscoe Boulevard, Panorama City, CA.

27

28

1    n.    Jose Juan MANCILLA-Monje (hereinafter MANCILLA-Monje):

2   an adult male, born in 1966, and whose last known residence is 3660

3   Robin Road, Lake Elsinore, CA.

4    o.    Edson SOLIS-Valdovinos (hereinafter SOLIS-Valdovinos):

5   an adult male, born in 1988, whose last known residence is unknown.

6    p.    Nancy BLANCAS-Pena (hereinafter BLANCAS-Pena): an adult

7   female, born in 1986, who resides at 546 Stewart Drive, Vista, CA.

8    q.    Hernan Sebastian BERNAL (hereinafter BERNAL): born in

9   1986, whose last known residence is 8767 Flagstone Ave., Riverside,

10  CA.

11    r.    Nathan Kahakulani YASSO (hereinafter YASSO) an adult

12  male, born in 1944, whose last known residence is 1876 Mesquite Canyon

13  Dr, Henderson, NV.

14    s.    Leonardo R. GARCIA-Gaytan (hereinafter GARCIA) an adult

15  male, born in 1987, whose last known address is 3646 8th Street, San

16  Marcos, CA.

17                              III

18    **SEARCH WARRANTS:   LOCATIONS TO BE SEARCHED**

19    11.   Through my training and experience, I have learned that:

20    a.    Individuals involved in drug trafficking often maintain

21  the following items in their residences and businesses: controlled

22  substances   and   paraphernalia   for   packaging,   weighing,   cutting,

23  testing,   distributing,   manufacturing   and   identifying   controlled

24  substances, at their residences.

25    b.    Furthermore, individuals involved in drug trafficking

26  often   maintain   records   and   ledgers   evidencing   drug   trafficking

27  activities   in   order   to   keep   track   of   the   ordering,   purchasing,

28  storage, distribution and transportation of drugs, in their residences

7

1 and businesses. In fact, I have seen instances where, even after the
2 drugs are sold, documentary records and ledgers remain for long
3 periods of time to memorialize past transactions, the status of the
4 accounts receivable and accounts payable, and the names, identities
5 and telephone numbers of suppliers, customers and co-conspirators.

6      c. Individuals involved in drug trafficking must often
7 rely on others to obtain their drugs and to help them market the
8 drugs. Frequently, traffickers maintain evidence of the identities of
9 these co-conspirators at their residences and businesses.

10      d. Individuals involved in drug trafficking commonly earn
11 income in the form of cash and try to legitimize these profits. In
12 order to do this, traffickers frequently attempt to secrete, transfer
13 and conceal the money by means, including, but not limited to: placing
14 assets in names other than their own to avoid detection while
15 maintaining control; laundering the money through what appears to be
16 legitimate business or businesses; hiding money in their homes, safes
17 and safety deposit boxes; or using the money to buy assets which are
18 difficult to trace. Records of the these and other types of
19 transactions are often found at the residences and businesses of
20 individuals involved in drug trafficking.

21      e. Individuals involved in drug trafficking often keep and
22 maintain large amounts of United States currency at their residences
23 and businesses. Such funds are often used for every day expenditures
24 and to maintain and finance their ongoing drug business.
25 Additionally, individuals involved in drug trafficking often amass and
26 maintain assets at their residences and businesses which were
27 generated by through their trafficking activities, or purchased with
28 the cash earned from such trafficking.

f. Individuals involved in drug trafficking often maintain weapons, firearms and ammunition on their person or in their residences, businesses, and/or vehicles. Such weapons and firearms are used, and can be used, as an instrumentality of the crime of possession and distribution of drugs. Furthermore, I am aware of instances in which traffickers have maintained such items in their residences, businesses, and vehicles in order to protect themselves and guard their drugs and drug profits, as well as for enforcement purposes during their drug dealings.

g. Residences, businesses, and other premises used by individuals involved in drug trafficking usually contain articles of personal property evidencing the identity of person(s) occupying, possessing, residing in, owning, frequenting or controlling the residence and premise.

h. Individuals involved in drug trafficking frequently communicate with co-conspirators by means of cellular telephones, electronic paging devices, computers, and other portable electronic communications devices and usually maintain these items on their person and/or in their residences, businesses, and vehicles.

i. Individuals involved in drug trafficking often utilize radio scanners, police radios and other electronic equipment in order to conduct counter-surveillance upon law enforcement authorities, and usually maintain these items on their person and/or in their residences, businesses, and vehicles.

j. Individuals involved in drug trafficking often maintain photographs, and/or audio and video recordings of their associates or real and personal property which were acquired with drug proceeds or property utilized to facilitate drug trafficking activities. Such

9

1 items are typically maintained in their residences and businesses
2 either in hard copy or in digital format which is stored in phones,
3 digital cameras and camcorders, portable memory devices, or on
4 computers and their associated hardware.

5 12. Based on my training and experience, and the facts contained
6 within this affidavit, there is probable cause to believe that the
7 following locations (including vehicles parked in the driveway, yard,
8 garage, or designated parking space at those locations) (collectively
9 the SUBJECT PREMISES) contain evidence, instrumentalities, and fruits
10 of violations of the following offenses:

11 a. Conspiracy to distribute, and possession with intent to
12 distribute, controlled substances, in violation of Title 21, U.S.C.
13 Secs. 846, and 841(a)(1);

14 b. Conspiracy to import, and importation of, controlled
15 substances, in violation of Title 21, U.S.C. Secs. 952, 960, and 963;

16 c. Conspiracy to Launder Monetary Instruments, in violation of
17 Title 18, U.S.C. Sec. 1956(h);

18 as further detailed in Attachment B.

19                                    IV

20                          **THE SUBJECT PREMISES**

21 13. The Subject Premises to be searched are listed below, and
22 are described in further detail in Attachment A1-6:

23 a. 1118 Cochise Court, Vista, California, further
24 described in Attachment A-1 (hereinafter "Cochise Residence"):
25 According to surveillance, wiretaps, utility records, and other
26 evidence, this location is the primary residence of RODRIGUEZ-Lara,
27 SANCHEZ-Zarate, PEREZ, and LARA.

28

b. 521 Concepcion Avenue, Spring Valley, California, further described in Attachment A-2 (hereinafter "Concepcion Residence"): According to surveillance, wiretaps, utility records and other evidence, this location is MARCIAL and NIEVES' primary residence.

c. 1145 Barham Drive, Space #4, San Marcos, California, further described in Attachment A-3 (hereinafter "Barham Residence"): According to surveillance, wiretaps, utility records, and other evidence, this location is LOPEZ's primary residence.

d. 3668 La Mirada Drive, San Marcos, California, further described in Attachment A-4 (hereinafter "La Mirada Residence"): According to surveillance, wiretaps, utility records, and other evidence, this location is AGUILAR's primary residence.

e. 820 Sycamore Avenue, Apartment #238, Vista, California, further described in Attachment A-5 (hereinafter "Sycamore Residence"): According to surveillance, wiretaps, utility records, and other evidence, this location is JAIME's primary residence.

f. 4624 Maple Avenue, Oceanside, California, further described in Attachment A-6 (hereinafter "Maple Residence"): According to surveillance, wiretaps, utility records, and other evidence, this location is MARIN's primary residence.

V

**PROBABLE CAUSE FOR ARREST AND SEARCH WARRANTS**

14. Because the purpose of this affidavit is to set forth only those facts necessary to establish probable cause for the warrants, I have not described all of the relevant facts and circumstances of which I am aware. In addition, when I rely on statements made by others, such statements are set forth in part and in substance unless

11

otherwise indicated.  Facts not stated in this affidavit are not being relied upon to reach my conclusion that criminal complaints, arrest and search warrants should be issued.  This investigation involved the court-authorized interception of wire communications of telephones used by RODRIGUEZ-Lara, MARCIAL, GARCIA-Gallegos, and others, which have been ongoing, with brief periods of interruption, since May 21, 2012.

15.  During the intercepted conversations, cryptic or coded language to discuss drug trafficking was often used.  Through training and experience and subsequent drug seizures based on wiretap calls, I have determined that many of the terms used to describe drugs and drug cash include the pronouns like "it", "that", "those", and "them".  Based upon my experience in this and other drug investigations, I know that drugs and drug cash are also referred to as "girls", "guys", "groceries", "gallons of milk", "clothes", "cars", "trucks", "invoices", and "papers", as well as other code words.  Moreover, the wiretap calls described below are some of the pertinent conversations that were selected to demonstrate the scope of the drug trafficking organization and to identify some of the co-conspirators in that organization.  The listed conversations are not exhaustive of all the pertinent conversations intercepted during the wiretap investigation.  Moreover, because many of the relevant calls contain some non-pertinent conversations, I have tried to describe only the pertinent portions without altering the context of the calls.

16.  The identities of the suspects were ascertained through a variety of methods.  Some of these methods included names used by speakers themselves during intercepted conversations and surveillance activity revealing that a co-conspirator was at a particular location

being called by one of the individuals intercepted. Observations were made, with respect to each subject, on occasions when the subjects were doing things consistent with what they had discussed during intercepted conversations. By listening to the conversations, verbally identifying the participants in the conversations, and then conducting surveillance in the areas where it was believed the conversations were located, the investigators were able to identify the participants in the conversation visually and, therefore, to confirm the participants in the narcotics trafficking conspiracy. The intercepted conversations referred to below were primarily in Spanish. The speakers have been identified by subscriber information, surveillance, court-authorized GPS location data information, voice identification by agents and monitors who have compared voices, by the speakers' own identification of themselves, or by arresting the individuals after drug transactions were completed and finding the telephone device on the suspect.

## OVERVIEW OF INVESTIGATION

17. The San Diego Field Division of the Drug Enforcement Administration (DEA) is conducting an investigation into the narcotics trafficking activities of Jose Isidro RODRIGUEZ-Lara. RODRIGUEZ-Lara was identified to DEA as a suspected methamphetamine trafficker and in early 2012, DEA agents assigned to the Major Mexican Traffickers Task Force began to investigate RODRIGUEZ-Lara's activity.

**March 21, 2012 Drug Transaction at La Mirada Residence & Seizure of One-Quarter Pound of Methamphetamine from MANCILLA-Monje and SOLIS-Valdovinos**

18. On March 21, 2012, San Diego DEA Agents established surveillance at the Cochise Residence, in Vista, CA, which is the residence of RODRIGUEZ-Lara. At approximately 3:00 p.m., agents

13

observed a Black Ford F-250 pickup truck (the F-250), bearing CA license plate 8Y84184, registered to Jose I. Lara and/or Silvia Sanchez, 1118 Cochise Court, Vista, CA, (the Cochise Residence) depart the residence. Agents identified the driver of the vehicle as RODRIGUEZ-Lara and followed him. RODRIGUEZ-Lara made no stops and parked on the corner of Starstone Drive and La Mirada Drive, in San Marcos, CA. RODRIGUEZ-Lara got out of the F-250 and began to manipulate a cell phone. RODRIGUEZ-Lara was seen carrying a white plastic grocery-style bag containing something yellow in color. A Hispanic male matching the description of David AGUILAR was seen walking northbound on Starstone Drive towards RODRIGUEZ-Lara's location. AGUILAR met with RODRIGUEZ-Lara and both of them then entered the front property of the La Mirada Residence. Two additional unidentified Hispanic males (UM1 and UM2) stood on the front porch area of the La Mirada Residence. RODRIGUEZ-Lara and AGUILAR then opened the left-side garage door of the residence, went inside the garage, and closed the garage door. UM1 and UM2 remained near the front porch of the residence.

19. At approximately 3:35 p.m., agents observed the garage door of the residence open and four Hispanic adult males exit the garage. One of the adult males, RODRIGUEZ-Lara, entered the F-250 pick-up truck. UM1 and UM2 entered the white Chrysler Sebring (the Sebring). UM1 was carrying what appeared to be a manila envelope folded in thirds in his left hand. He entered the passenger side of the Sebring. The second of the two men, wearing a primarily red shirt with thin black stripes (UM2), walked toward the Sebring, pulled a set of keys from his pants pocket and opened the driver side door of the Sebring and sat in the driver's seat. While inside the Sebring, UM1

14

1  and UM2 were seen leaning toward the center console and were looking
2  down with their heads down, approximately six inches apart, for
3  approximately one minute. Both males then sat upright in the vehicle,
4  the brake lights came on, and the Sebring departed the residence.
5  AGUILAR proceeded to walk southbound from the La Mirada Residence on
6  Starstone Drive. Shortly after the men's departure the garage door of
7  the residence closed.

8      20. Agents then focused the attention of the surveillance to the
9  Sebring and followed the vehicle continuously northbound on Rancho
10 Santa Fe Road, eastbound on California Highway 78, and northbound on
11 United States Interstate 15 (US I-15) until the Sebring exited onto
12 California Highway 76 eastbound in the direction of Pala Indian
13 Reservation. Agents continued to follow the Sebring east on CA
14 Highway 76. The vehicle then made a left turn onto Pala Road and
15 continued northbound.

16     21. At this point agents coordinated with the United States
17 Border Patrol (USBP) Murrieta Station and requested a USBP official to
18 conduct a traffic stop of the Sebring. At approximately 5:00 p.m.,
19 USBP Agents conducted a traffic stop of the Sebring in Temecula, CA.
20 During the stop, the driver was identified as Jose Juan MANCILLA-Monje
21 and the passenger was identified as Edson SOLIS-Valdovinos. During a
22 consent search of the vehicle, USBP Agents located a yellow manila
23 envelope which contained approximately one-quarter pound of
24 methamphetamine hidden in a compartment of the front center console.
25 Both MANCILLA-Monje and SOLIS-Valdevinos were detained for possession
26 of a controlled substance, but were later released.
27
28

**Arrest of RODRIGUEZ-Lara on May 9, 2012 & Seizure of One Kilogram of Methamphetamine**

22. On May 9, 2012, unrelated to any ongoing investigation in San Diego, an Orange County Sheriff's Deputy initiated a traffic stop on the Ford F-250 driven by RODRIGUEZ-Lara as RODRIGUEZ-Lara traveled southbound on Interstate 5 Freeway, just south of San Clemente, California. During the traffic stop, which was initiated due to RODRIGUEZ-Lara's use of a cellular telephone while driving, the Sheriff's Deputy obtained RODRIGUEZ-Lara's consent to search the F-250. During the search which followed, approximately one kilogram of methamphetamine was found in a plastic container located within the passenger compartment of the F-250.

23. Subsequent to this seizure, RODRIGUEZ-Lara was read his Miranda rights, waived them, and agreed to speak with Orange County narcotics detectives who had arrived. In an interview, RODRIGUEZ-Lara admitted that he knew that he was transporting methamphetamine, and expressed a desire to cooperate. He informed detectives that he had received the drugs from an individual known only to him as "LALO" and provided a telephone number for LALO. He also stated he had been instructed to deliver the drugs to an unknown person at a Target Store parking lot in San Diego, California. While RODRIGUEZ-Lara did provide a telephone number he said belonged to "LALO" and pointed out an address where he said he had gone to and received the drugs from "LALO," he stated that this was only his second time ever transporting drugs. He also stated that he was going to be paid $300 to transport the drugs, even though he had approximately $1,700 in cash in his possession at the time he was stopped. He also claimed to have very limited information about drug trafficking, and at no point during the

interview did RODRIGUEZ-Lara provide any information about his past drug trafficking activities. RODRIGUEZ-Lara was booked into custody on May 9, 2012 and released from custody on May 12, 2012, with the District Attorney agreeing to not file charges immediately in order to pursue potential cooperation. When he was booked RODRIGUEZ-Lara was instructed by detectives to contact them when he was released from custody and also to contact them regarding any further drug trafficking information of which he was aware. Since his release on May 12, 2012, RODRIGUEZ-Lara has not made contact with detectives.

**Importation of drugs involving RODRIGUEZ-Lara, MARCIAL, NIEVES and others on June 24, 2012 and Delivery of Narcotics by PEREZ to GUTIERREZ-Marentes on June 25, 2012**

24. On June 24, 2012, a number of intercepted calls involving MARCIAL, RODRIGUEZ-Lara, and others alerted agents to the fact that MARCIAL and NIEVES were planning on crossing drugs into the United States from Mexico and then providing them to RODRIGUEZ-Lara.

25. On June 24, 2012, at approximately 5:00 p.m., MARCIAL made an outgoing call to NIEVES. During the call MARCIAL told NIEVES that "ISIDRO" (RODRIGUEZ-Lara) had said "all this week, alright" [referring to crossing loads of narcotics all week from Tijuana, Mexico to the United States]. NIEVES acknowledged and asked if "it" (crossing shipment of narcotics) was going to be done today. MARCIAL said yes. NIEVES asked at what time. MARCIAL stated he was going to see how much of a line (wait time at the border) there was.

26. On June 24, 2012, at approximately 8:35 p.m., the Mexico-based source of supply for the drugs spoke by telephone with MARCIAL. During the call MARCIAL said he would shower the kids, then "head over" (to pick up the narcotics in Tijuana, Mexico). The source of supply asked if that "guy" (RODRIGUEZ-Lara) had told him (MARCIAL)

to give him (source of supply) some money (payment for the drugs). MARCIAL said he (RODRIGUEZ-Lara) had not said anything. The source of supply said he would be waiting for him (MARCIAL) and said he (source of supply) had the "trucks" (units of narcotics) "there" (at a stash location in Tijuana) and was "preparing them" (packaging the narcotics to cross into the United States). MARCIAL acknowledged.

27. Border crossing information confirms that on June 25, 2012 at approximately 1:43 a.m., MARCIAL, NIEVES, and a minor child entered into the United States through the San Ysidro Port of Entry (POE) in a Honda CRV, CA license 5GUD022, registered to Lourdes CRUZ, 3201 Rustic Meadow Trail, Mansfield, Texas. This is the same vehicle has been seen consistently by agents at the Concepcion Residence throughout the course of the investigation.

28. Based on the above mentioned interceptions, as well as the fact that the border crossings for MARCIAL confirmed that he crossed from Tijuana, Mexico into the United States, agents suspected that on June 25, 2012, MARCIAL and RODRIGUEZ-Lara would meet in order to transfer the shipment of narcotics from MARCIAL to RODRIGUEZ-Lara.

29. On June 25, 2012, at approximately 8:15 a.m., agents established surveillance at the Concepcion Residence. Agents observed a maroon Honda CRV, CA 5GUD022 (the same vehicle in which MARCIAL and NIEVES entered the United States) parked in the driveway of the residence.

At approximately 1:48 p.m., agents observed a black Acura MDX sport utility vehicle, CA 4PZY519, driven by RODRIGUEZ-Lara, arrive at the Concepcion Residence. At approximately 1:52 p.m., agents observed RODRIGUEZ-Lara depart the Concepcion Residence and travel north on Highway 125. Agents continuously followed RODRIGUEZ-Lara to the

18

Cochise Residence.  At approximately 3:57 p.m., agents observed a silver Mitsubishi Galant arrive at the Cochise Residence.  At approximately 5:05 p.m., agents observed RODRIGUEZ-Lara depart the Cochise Residence driving his black Ford F250 truck, CA 8Y84184. Agents followed RODRIGUEZ-Lara westbound on Highway 78 and northbound on Interstate 5.

30.  At approximately 5:15 p.m., RODRIGUEZ-Lara made an outgoing call to Guadalupe Natalie PEREZ.  During the call RODRIGUEZ-Lara asked PEREZ where she was.  PEREZ said she was going to get on the freeway, the "78" (Highway 78), the one by the Denny's.  RODRIGUEZ-Lara told PEREZ to hold on because he was "up there" (northbound on Interstate 5).  PEREZ acknowledged.  At approximately 5:25 p.m., agents observed RODRIGUEZ-Lara pass through the United States Border Patrol Checkpoint in San Clemente (which was not open at the time).  Agents then observed RODRIGUEZ-Lara exit the next off-ramp and head south on Interstate 5.  At that point agents terminated surveillance of RODRIGUEZ-Lara.

31.  At approximately 5:28 p.m., RODRIGUEZ-Lara made an outgoing call to PEREZ.  During the call, PEREZ stated she was 3 miles until the "rest area" (California State rest area south of the US Border Patrol Checkpoint on Interstate 5).  RODRIGUEZ-Lara told PEREZ to come because it was "clean" (the USBP checkpoint was not operational). PEREZ asked RODRIGUEZ-Lara if she should go and asked if there wasn't "anything" (law enforcement).  RODRIGUEZ-Lara said no and told PEREZ to be careful.

32.  At approximately 5:37 p.m., RODRIGUEZ-Lara called PEREZ. During the call, RODRIGUEZ-Lara asked PEREZ where she was.  PEREZ stated she had already passed the "inspection" (USBP Checkpoint).

1  RODRIGUEZ-Lara   acknowledged   and   told   PEREZ   to   be   careful.
2  RODRIGUEZ-Lara asked PEREZ if she had something to write down the
3  "guy's" (person to receive the drug shipment) number. PEREZ said no,
4  she only had her phone. PEREZ told RODRIGUEZ-Lara to hold on and she
5  would call him back. At approximately 5:40 p.m., PEREZ called
6  RODRIGUEZ-Lara back. During the call, PEREZ asked RODRIGUEZ-Lara for
7  the number. RODRIGUEZ-Lara provided PEREZ with telephone number (818)
8  398-9817. PEREZ asked for his name. RODRIGUEZ-Lara said "MIGUEL"
9  (later identified as Miguel GUTIERREZ-Marentes). RODRIGUEZ-Lara told
10 PEREZ that he (GUTIERREZ-Marentes) could tell her how to get there.
11 PEREZ called RODRIGUEZ-Lara back a short time later and asked him if
12 the number (GUTIERREZ-Marentes's) was 818-398-9817, because she was
13 calling him (GUTIERREZ-Marentes) and that number was out of service.
14 RODRIGUEZ-Lara said he was going to call him and then would call her
15 back in one minute. RODRIGUEZ-Lara called back to PEREZ and informed
16 her that the number was actually (818) 389-9817. PEREZ repeated and
17 confirmed the number.

18       33.   At approximately 7:45 p.m., RORRIGUEZ-Lara received another
19 call from PEREZ. During the call, PEREZ told RODRIGUEZ-Lara she had
20 arrived. RODRIGUEZ-Lara asked PEREZ if she had seen [delivered the
21 narcotics] the "guy" (GUTIERREZ-Marentes). PEREZ stated she was with
22 him (GUTIERREZ-Marentes) right now. RODRIGUEZ-Lara thanked PEREZ and
23 told her to come back the same way.

24
**Travel of MARCIAL and NIEVES to Tijuana To Transport Narcotics on June**
25 **26, 2012**

26       34.   On June 26, 2012 a number of intercepted calls involving
27 MARCIAL and RODRIGUEZ-Lara indicated that MARCIAL was again going to
28 receive drugs in Tijuana and then cross them into the United States

for RODRIGUEZ-Lara. Among the calls, at approximately 3:19 p.m, a Tijuana source of supply called MARCIAL. During the call, MARCIAL asked him if "they" were going to "work" [coordinate and cross a drug shipment] today. The Tijuana source of supply affirmed and asked at what time would he "see" [meet and transfer drug shipment to MARCIAL in Tijuana, Mexico]. MARCIAL said around 8:00 (PM) and then changed his mind and said the kid (MARCIAL's son) had an appointment with the doctor at 8:00 (PM) so maybe 10:00 (PM). The Tijuana source of supply said at 10 (PM) he would know what was going on and be "ready" (to transfer drug shipment to MARCIAL).

35. Border crossing information confirms that on June 26, 2012 at approximately 11:46 p.m., MARCIAL and NIEVES, along with a minor child, entered into the United States through the San Ysidro Port of Entry (POE) in the same Honda CRV in which they had previously crossed.

36. Based on the wire interceptions, as well as the border crossing information confirming MARCIAL and NIEVES entered into the United States, agents determined that MARCIAL and RODRIGUEZ-Lara would meet up on June 27, 2012 in order to transfer the drug shipment to RODRIGUEZ-Lara.

**Seizure of 1 Pound of Methamphetamine and Arrest of Julio RODRIGUEZ-Zarate on June 27, 2012 in Vista, CA.**

37. On June 27, 2012, at approximately 7:30 AM, agents established surveillance at the Cochise Residence. At approximately 7:55 AM, RODRIGUEZ-Lara made an outgoing call to (760) 936-3838, used by an Unidentified Male (UM). During the call, RODRIGUEZ-Lara told the UM to come over (to the Cochise Residence). The UM told RODRIGUEZ-Lara he (UM) was going to be working at "the hotel" at 10:00

21

or 11:00 at the latest. RODRIGUEZ-Lara said he would head over there (to the hotel). RODRIGUEZ-Lara asked the UM if "a corner" (1/4 pound of methamphetamine) or "everything" (one pound of methamphetamine). The UM said "everything" (1 pound of methamphetamine) as "they" (UM and RODRIGUEZ-Lara) had agreed. RODRIGUEZ-Lara told the UM he only had a "half a hand" (half-pound of methamphetamine). The UM said "they" (UM and RODRIGUEZ-Lara) had agreed on getting all that was available. The UM asked RODRIGUEZ-Lara if he only got "half a hand" (half-pound of methamphetamine). RODRIGUEZ-Lara said he would get the other "half" (half-pound of methamphetamine).

38. At approximately 8:33 a.m., RODRIGUEZ-Lara made an outgoing call to Felipe GARCIA-Gallegos. During the call, RODRIGUEZ-Lara told GARCIA-Gallegos that he (RODRIGUEZ-Lara) needed the "loose bag" (bag with half-pound of methamphetamine) that he (GARCIA-Gallegos) had. GARCIA-Gallegos asked RODRIGUEZ-Lara if he would see him (RODRIGUEZ-Lara) at the gas station or did he (RODRIGUEZ-Lara) want him (GARCIA-Gallegos) to head over there (the Cochise Residence). RODRIGUEZ-Lara told GARCIA-Gallegos to stop by (the Cochise Residence).

39. At approximately 8:50 AM, agents observed a heavy-set Hispanic male, later identified as GARCIA-Gallegos, driving a white Chevrolet Suburban arrive in the vicinity of the Cochise Residence. At approximately 9:00 AM, agents observed the white Chevrolet Suburban depart the vicinity of the residence.

40. At approximately 10:20 AM, agents observed RODRIGUEZ-Lara depart the residence in a black Acura MDX, CA 4PZY519 (the black Acura), with SANCHEZ-Zarate as a passenger in the vehicle. Agents

22

followed them from the Cochise Residence and at approximately 10:27 AM, they arrived at the Vista Inn, 745 W. Vista Way, Vista, CA.

41. At approximately 10:28 AM, RODRIGUEZ-Lara, made an outgoing call to (760) 936-3838, used by the UM. During the call, the UM told RODRIGUEZ-Lara he was already there (at the hotel) and asked RODRIGUEZ-Lara to come over. RODRIGUEZ-Lara asked where the UM was at because RODRIGUEZ-Lara was right outside (the hotel). The UM said he was at the hotel and told RODRIGUEZ-Lara to come inside. RODRIGUEZ-Lara acknowledged.

42. Agents then observed RODRIGUEZ-Lara drive into the parking lot of the Vista Inn and park next to a blue Ford pickup truck. Agents observed RODRIGUEZ-Lara get out of his vehicle and meet with a Hispanic male with a shaved head and moustache, later identified as Julio Cesar RODRIGUEZ-Zarate. Agents continued to observe RODRIGUEZ-Lara and the subject talk for approximately 25 minutes. At approximately 10:52 AM, agents observed RODRIGUEZ-Lara and SANCHEZ-Zarate depart the Vista Inn in the black Acura. The agents who remained on surveillance of RODRIGUEZ-Lara and SANCHEZ-Zarate as they departed the Vista Inn in the black Acura MDX followed them back to the Cochise Residence. Other agents remained watching the subject at the Vista Inn.

43. The agents who remained at the Vista Inn observed the subject doing landscaping chores and load shovels and other landscaping tools into the back of the blue Ford pickup truck. The agents also observed another Hispanic male doing landscaping chores. The two subjects then got into a blue Ford F-150 truck, CA 2U32196, and departed the Vista Inn. Agents then coordinated with the San Diego Sheriff's Department (SDSD) to conduct a traffic stop of the

23

1 blue Ford F-150 truck. The traffic stop resulted in the seizure of
2 approximately one pound of methamphetamine and the arrest of Julio
3 Cesar RODRIGUEZ-Zarate (the driver of the blue truck who agents
4 observed meeting with RODRIGUEZ-Lara) and his passenger. Both
5 individuals were later released.

6 **June 27, 2012: Additional Surveillance of RODRIGUEZ-Lara and
  SANCHEZ-Zarate and Delivery of Narcotics to Alma JAIME at Sycamore
7 Ridge Apartment Complex, 820 Sycamore Avenue, Vista, CA**

8 44. On June 27, 2012, at approximately 11:23 a.m.,
9 RODRIGUEZ-Lara received an incoming call from (760) 331-4351, used by
10 an unidentified female (UF) who was later identified through other
11 investigation, including voice comparison, as Alma JAIME. During the
12 call, JAIME told RODRIGUEZ-Lara she (JAIME) was "ready" (to conduct a
13 drug transaction). RODRIGUEZ-Lara asked if there was any problem
14 (with the quality of previous drugs). JAIME said not right now and
15 said she didn't want any (problems) either. RODRIGUEZ-Lara said "it"
16 (narcotics) was the same thing, but it was a little "mixed". JAIME
17 asked RODRIGUEZ-Lara if he (RODRIGUEZ-Lara) was going to stop by
18 (JAIME's residence). RODRIGUEZ-Lara said yes, in about 20 minutes to
19 a half hour. JAIME acknowledged. JAIME asked if "Silvia"
20 (SANCHEZ-Zarate) had her cell phone, because she (JAIME) was calling,
21 but she (SANCHEZ-Zarate) was not answering. RODRIGUEZ-Lara said no.

22 45. At approximately 12:41 p.m., agents observed RODRIGUEZ-Lara
23 depart the Cochise Residence driving the black Acura MDX. Agents
24 observed SANCHEZ-Zarate as a passenger in the vehicle. At
25 approximately 12:55 p.m., agents observed RODRIGUEZ-Lara arrive at the
26 Sycamore Ridge Apartment Complex, 820 Sycamore Avenue, Vista, CA (the
27 Sycamore Residence). Agents were not able to observe which apartment
28 RODRIGUEZ-Lara approached, but suspected this to be the apartment

24

1 complex where JAIME resided. At approximately 1:01 p.m., agents
2 observed RODRIGUEZ-Lara depart the apartment complex in the black
3 Acura MDX. Agents continued to follow RODRIGUEZ-Lara until he arrived
4 in the black Acura at the Concepcion Residence, in Spring Valley, CA.
5 **Seizure of 3 kilograms of Cocaine, 4 Pounds of Methamphetamine, and**
6 **the Arrest of Miguel GUTIERREZ-Marentes in Panorama City, CA on June 27, 2012**

7 46. On this same date, agents maintained surveillance of
8 RODRIGUEZ-Lara throughout the day. At approximately 1:52 p.m., agents
9 observed RODRIGUEZ-Lara and SANCHEZ-Zarate arrive at the Concepcion
10 Residence in the black Acura MDX SUV and park in front of the driveway
11 of the residence. Agents observed MARCIAL come out of the residence
12 carrying a large lime green colored bag and pass it through the front
13 passenger window of the black Acura MDX SUV. Agents observed MARCIAL
14 converse through the open passenger window of the vehicle, and then
15 observed RODRIGUEZ-Lara and SANCHEZ-Zarate depart the Concepcion
16 Residence. At approximately 2:55 p.m., agents observed RODRIGUEZ-Lara
17 and SANCHEZ-Zarate arrive at the Cochise Residence.

18 47. At approximately 3:23 p.m., agents observed a silver
19 Mitsubishi sedan, CA 5FDE306, driven by PEREZ arrive in the vicinity
20 of the Cochise Residence. At approximately 3:46 p.m., agents observed
21 RODRIGUEZ-Lara depart the residence in his black Ford F-250 pickup
22 truck. Some agents followed RODRIGUEZ-Lara while others remained at
23 the Cochise Residence. At approximately 3:57 p.m., agents who
24 remained on surveillance at the Cochise Residence observed the silver
25 Mitsubishi, driven by PEREZ, depart the vicinity of the residence.
26 Agents maintained surveillance of PEREZ and followed her westbound on
27 Highway 78, then northbound on Interstate 5.

28

1    48. At approximately 4:09 p.m., RODRIGUEZ-Lara received an
2  incoming call from PEREZ. During the call, PEREZ asked RODRIGUEZ-Lara
3  if she should start going up "there" (northbound with the drug
4  shipment). RODRIGUEZ-Lara stated yes. PEREZ told RODRIGUEZ-Lara she
5  was going to take the "five" (Interstate 5). RODRIGUEZ-Lara
6  acknowledged and told PEREZ to wait five minutes for him
7  (RODRIGUEZ-Lara) because he was going to stop for a second at the rest
8  area and would call her back. PEREZ said okay.

9    49. At approximately 4:14 p.m., RODRIGUEZ-Lara received an
10  incoming call from PEREZ. During the call PEREZ asked RODRIGUEZ-Lara
11  if it was already at that "place" (USBP Checkpoint). RODRIGUEZ-Lara
12  told PEREZ he would tell her soon. PEREZ said she was already on the
13  "five" (Interstate 5). RODRIGUEZ-Lara told PEREZ he would call her
14  soon.

15    50. At approximately 4:21 p.m., RODRIGUEZ-Lara made a call to
16  PEREZ. During the call, RODRIGUEZ-Lara told PEREZ that he "left the
17  door open" [that the USBP Checkpoint was not operational and safe for
18  her to proceed with drug shipment]. PEREZ asked which door and
19  RODRIGUEZ-Lara stated the "front door". PEREZ asked RODRIGUEZ-Lara if
20  she could continue and he said yes.

21    51. At approximately 4:33 p.m., RODRIGUEZ-Lara made an outgoing
22  call to PEREZ. During the call RODRIGUEZ-Lara asked PEREZ if she had
23  the "guy's" (subject who would receive the drug shipment) phone
24  number. PEREZ replied she did. RODRIGUEZ-Lara told PEREZ to call
25  him, because "he" (source of supply) wanted him (RODRIGUEZ-Lara) to
26  call him (subject receiving the drug shipment) early. RODRIGUEZ-Lara
27  said he thought the guy was in the area close by so she (PEREZ) didn't
28  have to go all the way to his house.

52. Agents continued surveillance of PEREZ while she drove north on Interstate 5 and coordinated with the California Multi-jurisdictional Methamphetamine Enforcement Team (Cal-MMET) to assist in the surveillance. Cal-MMET investigators took over the surveillance in the vicinity of Interstate 5 near Whittier, CA. Cal-MMET investigators followed PEREZ in the silver Mitsubishi sedan to an alleyway in the vicinity of 13841 Roscoe Blvd, Panorama City, CA. Investigators observed a Hispanic male come out of the back door of the residence in the alleyway and meet with PEREZ at the silver Mitsubishi sedan for less than five minutes. Investigators observed PEREZ depart the alleyway and again drive southbound on Interstate 5. Further wire interceptions confirmed that PEREZ had delivered the narcotics and was returning to San Diego, CA.

53. Cal-MMET investigators maintained surveillance of the Panorama City residence and observed the same Hispanic male exit the rear alleyway door. Investigators observed him approach a Ford Edge vehicle and get inside. Investigators contacted the subject, later identified as Miguel Angel GUTIERREZ-Marentes, and seized approximately 3 kilograms of cocaine within a lime green colored bag which was inside the vehicle. Investigators also conducted a consent search of the vehicle and located a hidden compartment which contained a loaded handgun. Additionally, investigators conducted a consent search of the residence and seized approximately 4 pounds of methamphetamine.

**July 18, 2012: Cocaine Transfer from MARCIAL and GARCIA-Gallegos to Nancy BLANCAS-Pena and Attempted Delivery of Cocaine**

54. On July 17, 2012, through a number of intercepted calls involving RODRIGUEZ-Lara and MARCIAL, agents became aware that MARCIAL

27

was making arrangements to cross drugs into the United States for RODRIGUEZ-Lara. At approximately 5:27 p.m., RODRIGUEZ-Lara called MARCIAL and MARCIAL asked RODRIGUEZ-Lara if the "cars" (narcotics shipment) were urgent or could "they" (narcotics) wait until tomorrow. RODRIGUEZ-Lara replied the "trucks" (kilograms of cocaine) were urgent for "the man" (source of supply). MARCIAL acknowledged. RODRIGUEZ-Lara asked for MARCIAL's location, because it was not a big deal if "they" (MARCIAL and RODRIGUEZ-Lara) did "it" (crossing of narcotics shipment) tomorrow. MARCIAL agreed. RODRIGUEZ-Lara said they would be in touch early in the morning [to coordinate the transfer of the drug shipment from MARCIAL to RODRIGUEZ-Lara].

55. On July 17, 2012, at approximately 6:53 p.m., RODRIGUEZ-Lara, made an outgoing call to GARCIA-Gallegos. During the call, RODRIGUEZ-Lara asked GARCIA-Gallegos for a favor and asked him if he had the "girl's" (BLANCAS-Pena) number, "Nancy." GARCIA-Gallegos said yes. RODRIGUEZ-Lara asked GARCIA-Gallegos to call her (BLANCAS-Pena) and instructed GARCIA-Gallegos to ask her if she (BLANCAS-Pena) wants to "work" (transport drugs from San Diego) tomorrow. RODRIGUEZ-Lara elaborated that way when "they" (RODRIGUEZ-Lara and GARCIA-Gallegos) "meet" (pick up drugs) from "him" (MARCIAL), they can just "give" (transfer drugs) her (BLANCAS-Pena) "everything" (entire shipment of narcotics), so "they" (RODRIGUEZ-Lara and GARCIA-Gallegos) wouldn't have "anything" (narcotics) "there" (at stash location), and she (BLANCAS-Pena) can "take everything" (receive entire drug shipment). GARCIA-Gallegos asked RODRIGUEZ-Lara what time he should tell her (BLANCAS-Pena). RODRIGUEZ-Lara told GARCIA-Gallegos to tell her (BLANCAS-Pena) that "some trucks" (kilograms of cocaine) were going to "arrive" (be crossed into San

28

1 Diego) tomorrow and if she could "take them up" (transport the
2 kilograms of cocaine north of San Diego).

3    56.    On July 17, 2012, at approximately 7:13 p.m., RODRIGUEZ-Lara
4 called GARCIA-Gallegos and GARCIA-Gallegos informed RODRIGUEZ-Lara
5 that "she" (BLANCAS-Pena) could do it after 4:00 (PM). RODRIGUEZ-Lara
6 said okay, so tomorrow "they" (RODRIGUEZ-Lara and GARCIA-Gallegos)
7 would "pick up the cars" (receive the drug shipment from MARCIAL) and
8 take "them" (narcotics) over to her (BLANCAS-Pena). GARCIA-Gallegos
9 acknowledged   and   asked   RODRIGUEZ-Lara   to   keep   him   informed.
10 RODRIGUEZ-Lara said they would see what happens.

11    57.    On   July   17,   2012,   at   approximately   11:21   p.m.,
12 RODRIGUEZ-Lara   called   MARCIAL   who   told   RODRIGUEZ-Lara   that   he
13 (MARCIAL) was "arriving now" (had successfully crossed the narcotics
14 shipment   from   Tijuana   to   the   stash   location   in   San   Diego).
15 RODRIGUEZ-Lara asked MARCIAL how many "cars" (units of narcotics) he
16 (MARCIAL) had "brought" (crossed into United States). MARCIAL said he
17 thought there were "two trucks" (2 kilograms of cocaine) and "one car"
18 (1 pound of methamphetamine). RODRIGUEZ-Lara corrected MARCIAL and
19 said "three trucks" (3 kilograms of cocaine) and "one car" (one pound
20 of methamphetamine). MARCIAL said yes. RODRIGUEZ-Lara then said, so
21 "all together" (total amount of narcotics at the Concepcion Residence)
22 he (MARCIAL) had "five trucks" (5 kilograms of cocaine) and "two cars"
23 (2 pounds of methamphetamine). MARCIAL said he was checking to see if
24 it was "two trucks" and "one car".

25    58.    Border crossing information confirms that on July 17, 2012
26 at approximately 11:03 p.m., MARCIAL, NIEVES, and a minor child
27 entered into the United States through the San Ysidro Port of Entry
28 (POE) in the Honda CRV, CA 5GUD022. Based on the wiretap intercepts

29

above, agents further determined that RODRIGUEZ-Lara, GARCIA-Gallegos, and BLANCAS-Pena would further coordinate to receive the drug shipment the following day from MARCIAL and transport it to unknown customers north of San Diego.

59. On July 18, 2012, at approximately 8:15 a.m., agents established surveillance at the Concepcion Residence with the goal of observing MARCIAL transfer the drug shipment to RODRIGUEZ-Lara and GARCIA-Gallegos, who in turn, would transfer it to BLANCAS-Pena for the re-distribution north of San Diego.

60. On July 18, 2012, at approximately 12:22 p.m., RODRIGUEZ-Lara called GARCIA-Gallegos who told RODRIGUEZ-Lara he (GARICA-Gallegos) would go to San Ysidro first to get the "invoices" (drug proceeds) and then he (GARCIA-Gallegos) would call RODRIGUEZ-Lara's "buddy" (MARCIAL). GARCIA-Gallegos said he would call him (MARCIAL) right now to check if he was in the area to make sure they would be able to meet (transfer drug shipment) on time. RODRIGUEZ-Lara said "he" (MARCIAL) was by the "125" (California Highway 125) by El Cajon. During the call RODRIGUEZ-Lara instructed GARCIA-Gallegos to meet the "girl" (BLANCAS-Pena) on his (GARCIA-Gallegos') "way back" [to transfer the drug shipment to BLANCAS-Pena immediately after picking it up from MARCIAL]. GARCIA-Gallegos asked RODRIGUEZ-Lara "what" (quantity of narcotics) was at the "house" (narcotics stash location) was just going to stay "there" (remain at the stash location). RODRIGUEZ-Lara affirmed and told GARCIA-Gallegos he was only supposed to give "her" (BLANCAS-Pena) "five large trucks" (5 kilograms of cocaine) and to "keep" (hold at the stash location) the "two small one" (2 pounds of methamphetamine). GARCIA-Gallegos acknowledged and confirmed there were going to be

"five large ones" (5 kilograms of cocaine) and "two small ones" (2 pounds of methamphetamine). RODRIGUEZ-Lara acknowledged.

61. On this same date, at approximately 2:44 p.m, agents on surveillance at the Concepcion Residence observed GARCIA-Gallegos arrive at the residence driving a white Chevrolet Suburban, CA 5TBW079.

62. At approximately 2:45 p.m., RODRIGUEZ-Lara called MARCIAL who told RODRIGUEZ-Lara that the "dude" (GARCIA-Gallegos) had "arrived" (received the drug shipment from MARCIAL) already. At approximately 2:46 p.m., agents observed GARCIA-Gallegos depart the Concepcion Residence in the white Chevrolet Suburban. Agents followed GARCIA-Gallegos and at approximately 3:40 p.m,, GARCIA-Gallegos arrived at the 2133 N Santa Fe, Vista, CA (the North Santa Fe Residence).

63. At approximately 4:25 p.m., RODRIGUEZ-Lara called GARCIA-Gallegos and asked GARCIA-Gallegos for his location. GARCIA-Gallegos said he was at "home" (the North Santa Fe Residence). RODRIGUEZ-Lara asked if he (GARCIA-Gallegos) had seen the "girl" (BLANCAS-Pena). GARCIA-Gallegos said the "girl" (BLANCAS-Pena) would be there in 10 minutes. RODRIGUEZ-Lara told GARCIA-Gallegos to "send" (transfer to BLANCAS-Pena) "everything" (all the narcotics) he "got today" (picked up from MARCIAL). RODRIGUEZ-Lara told GARCIA-Gallegos,. except not what he (GARCIA-Gallegos) has "there" (at the North Santa Fe Residence), but all the "new stuff" (narcotics received from MARCIAL). GARCIA-Gallegos confirmed and asked RODRIGUEZ-Lara if it was just what he got today (from MARCIAL). RODRIGUEZ-Lara confirmed and told GARCIA-Gallegos to "send everything you got today" (transfer the narcotics received from MARCIAL to BLANCAS-Pena).

64. At approximately 4:36 p.m., agents observed GARCIA-Gallegos depart the North Santa Fe Residence in the white Chevrolet Suburban. Agents followed GARCIA-Gallegos and observed him arrive and park, at approximately 4:43 p.m., in the parking lot of the Northgate Market, 1150 E. Vista Way, Vista, CA. Agents then observed a black Audi sedan, CA 6ULR323 (registered to Nancy BLANCAS, 546 Stewart Drive, Vista, CA). Agents observed GARCIA-Gallegos get out of the white Chevrolet Suburban carrying a blue duffel bag, meet with a Hispanic female identified by agents as Nancy BLANCAS-Pena, and put the blue duffel bag into the trunk of the black Audi sedan. Agents observed GARCIA-Gallegos get back into the white Chevrolet Suburban and BLANCAS-Pena get back into the black Audi sedan. Agents observed both vehicles depart the parking lot and the focus of the attention of the surveillance remained on BLANCAS-Pena in the black Audi sedan.

65. Agents then followed BLANCAS-Pena to an apartment complex located at 3604-3606 Baycliff Way, Oceanside, CA. Agents observed BLANCAS-Pena park the vehicle briefly and open the trunk of the vehicle. A few minutes later, agents observed BLANCAS-Pena close the trunk of the vehicle and depart the apartment complex.

66. Agents next followed BLANCAS-Pena to the Starbucks drive-thru, 3702 Plaza Drive, Oceanside, CA. Agents then followed BLANCAS-Pena to Jose's Taco Depot, 3910 Vista Way, Oceanside, CA where she was seen entering the restaurant and ordering food to go. Agents then observed BLANCAS-Pena drive directly to a parking lot of the North County Health Services, 605 Couch Street, #C, Oceanside, CA.

67. At approximately 5:55 p.m., RODRIGUEZ-Lara made an outgoing call to GARCIA-Gallegos. During the call, GARCIA-Gallegos told RODRIGUEZ-Lara, the "dark girl" (BLANCAS-Pena) called and said she

32

1 couldn't "take the cars" (transport the narcotics) and she would try
2 later on. GARCIA-Gallegos told RODRIGUEZ-Lara she (BLANCAS-Pena)
3 wanted to know if "they" (RODRIGUEZ-Lara) could let the source of
4 supply know if they can't do "it" (transport drug shipment) today, it
5 would be tomorrow. RODRIGUEZ-Lara said "he" (source of supply) was
6 going to call "her" (BLANCAS-Pena).

7   68.   At approximately 5:56 p.m., agents observed an unidentified
8 Hispanic Female (UF), wearing a medical uniform, come out of the
9 building and approach BLANCAS-Pena in the black Audi sedan. Agents
10 observed BLANCAS-Pena and the UF converse and then observed the UF
11 return inside the building.

12   69.   At approximately 6:06 p.m., agents observed the UF exit the
13 building and enter a red Ford Focus sedan with paper plates. Agents
14 observed the UF park the red Ford Focus next to BLANCAS-Pena's black
15 Audi sedan. Agents observed BLANCAS-Pena and the UF open the trunks
16 to both vehicles, stand near the rear of their respective vehicles and
17 then close both trunks. Agents then observed BLANCAS-Pena get into
18 the driver's seat of the red Ford Focus and the UF get into the
19 driver's seat of the black Audi sedan. Agents then observed both
20 vehicles depart the parking lot.

21   70.   At approximately 6:21 p.m., agents observed BLANCAS-Pena
22 arrive in the vicinity of 546 Stewart Drive, Vista, CA (the Stewart
23 Residence). Agents observed BLANCAS-Pena park the red Ford Focus
24 across the street from the residence, get out of the vehicle and enter
25 the Stewart Residence.

26   71.   At approximately 8:46 p.m., RODRIGUEZ-Lara made an outgoing
27 call to the Guadalajara Trafficker. During the call, the Guadalajara
28 Trafficker told RODRIGUEZ-Lara that the "girl" (BLANCAS-Pena) called

asking for RODRIGUEZ-Lara to get a hold of her. The Guadalajara Trafficker said she (BLANCAS-Pena) never "left" (transported the drugs), but there was something strange going on. He said she (BLANCAS-Pena) mentioned something about "them" (law enforcement) seeing her (BLANCAS-Pena's) car. The Guadalajara Trafficker said she (BLANCAS-Pena) did not leave. He asked RODRIGUEZ-Lara to call her because she (BLANCAS-Pena) was nervous. RODRIGUEZ-Lara said he would give her a call. The Guadalajara Trafficker said he thought she (BLANCAS-Pena) was going to leave, but she had planned on "leaving" (transporting the drug shipment) tomorrow morning. He said she (BLANCAS-Pena) was now saying she would "switch cars" (transfer drug load to another load vehicle), to take the car, or better yet to have someone store "those things" (narcotics). The Guadalajara Trafficker suggested to RODRIGUEZ-Lara that he (RODRIGUEZ-Lara) send someone else to "pick it up" (take narcotics from BLANCAS-Pena).

72. At approximately 9:18 p.m., RODRIGUEZ-Lara made an outgoing call to the Guadalajara Trafficker. During the call, RODRIGUEZ-Lara told the Guadalajara Trafficker that the "girl" (BLANCAS-Pena) was "scared" (suspected she was followed by law enforcement). RODRIGUEZ-Lara said "she" (BLANCAS-Pena) and her "friend" (UF from red Ford Focus) saw "something strange" (law enforcement surveillance). The Guadalajara Trafficker asked what "they" (BLANCAS-Pena and UF) did. RODRIGUEZ-Lara said the "girl" (BLANCAS-Pena) thought about it (considered her options regarding law enforcement presence) and then "she" (BLANCAS-Pena) switched the cars (with UF). RODRIGUEZ-Lara said "she" (BLANCAS-Pena) showed up at her "friend's" (UF) place of work (Medical Center) since it was an enclosed area. RODRIGUEZ-Lara said the friend (UF) left first in "her car" (BLANCAS-Pena's black Audi

1 sedan), so that was when "she" (UF) had a "tail" (followed by law
2 enforcement) because "she" (BLANCAS-Pena) left and saw "it" (law
3 enforcement following UF). RODRIGUEZ-Lara said the "car" (red Ford
4 Focus load vehicle) was currently parked outside "her"
5 (BLANCAS-Pena's) mother's house (the Stewart Residence).
6 RODRIGUEZ-Lara said when she (BLANCAS-Pena) had time she would take
7 out the "pieces" (units of narcotics) and RODRIGUEZ-Lara would take
8 "them" (narcotics) or she (BLANCAS-Pena) could give "them" (narcotics)
9 to someone else RODRIGUEZ-Lara was going to send (to pick up the
10 narcotics from BLANCAS-Pena). The Guadalajara Trafficker asked
11 RODRIGUEZ-Lara if "she" (BLANCAS-Pena) put the "pieces" (narcotics) in
12 the "friend's" (UF's) vehicle (red Ford Focus) and that her
13 (BLANCAS-Pena's) car (black Audi sedan which the UF was driving) had
14 a "tail" (followed by surveillance). RODRIGUEZ-Lara said yes. The
15 Guadalajara Trafficker said it was strange. RODRIGUEZ-Lara agreed it
16 was strange and said maybe this "girl" (BLANCAS-Pena) was "on
17 something" (under the influence of drugs).

18 **July 19, 2012: Surveillance of GARCIA-Gallegos and SANCHEZ-Zarate;**
**transfer of drugs from GARCIA-Gallegos to SANCHEZ-Zarate and transfer**
19 **of drugs by GARCIA-Gallegos in Vista, CA**

20 73. Based on intercepted calls, agents determined that
21 GARCIA-Gallegos was planning to leave his residence with the narcotics
22 and transfer custody of the narcotics to the courier. At
23 approximately 5:00 p.m., agents established surveillance at the North
24 Santa Fe Residence. Agents observed GARCIA-Gallegos' white Chevrolet
25 Suburban, CA 5TWB079, parked on the property.

26 74. On July 19, 2012, at approximately 5:28 p.m., RODRIGUEZ-Lara
27 received an incoming call from SANCHEZ-Zarate. During the call
28 SANCHEZ-Zarate told RODRIGUEZ-Lara the "lady" (later identified as

JAIME) said "she" (JAIME) was going to need "two cars" (two units of narcotics). SANCHEZ-Zarate asked if he (RODRIGUEZ-Lara) still had "them" (narcotics). RODRIGUEZ-Lara said he would call "her" (JAIME).

75. At approximately 5:31 p.m., RODRIGUEZ-Lara called GARCIA-Gallegos and asked GARCIA-Gallegos' location. GARCIA-Gallegos said at home (the North Santa Fe Residence). RODRIGUEZ-Lara told GARCIA-Gallegos that his (RODRIGUEZ-Lara's) wife (SANCHEZ-Zarate) was going to stop by to pick up the "two items" (two units of narcotics) that he (GARCIA-Gallegos) had "there" (at the North Santa Fe Residence). RODRIGUEZ-Lara told GARCIA-Gallegos not the "loose ones" (raw crystal methamphetamine not packaged), but the "ones that are together" (packaged), the "two that are still packed up". GARCIA-Gallegos acknowledged. RODRIGUEZ-Lara said "she" (SANCHEZ-Zarate) was on her way because she (SANCHEZ-Zarate) needed to deliver "them" (2 units of narcotics).

76. At approximately 5:33 p.m., RODRIGUEZ-Lara called SANCHEZ-Zarate and told SANCHEZ-Zarate that she could go pick up the "2 cars" (2 units of narcotics) and the "tool box" (narcotics) that he (GARCIA-Gallegos) was going to give her (SANCHEZ-Zarate). RODRIGUEZ-Lara told SANCHEZ-Zarate to take it to the owner (JAIME) so "they" (SANCHEZ-Zarate and JAIME) could do the exchange (of narcotics). SANCHEZ-Zarate asked what exchange and said that she was at the store. RODRIGUEZ-Lara asked if she was going to take long, then said he would tell "her" (JAIME) that he (RODRIGUEZ-Lara) would do "it" (narcotics transaction) when he (RODRIGUEZ-Lara) arrived.

77. At approximately 5:38 p.m., RODRIGUEZ-Lara called GARCIA-Gallegos. During the call, RODRIGUEZ-Lara told GARCIA-Gallegos that his damned wife (SANCHEZ-Zarate) was not home and that damned

36

"Nati" (PEREZ) said she can't do it either. RODRIGUEZ-Lara asked GARCIA-Gallegos if he (GARCIA-Gallegos) could deliver the "two boxes of tools" (2 units of narcotics). GARCIA-Gallegos said he could do "it" (deliver the narcotics to RODRIGUEZ-Lara's residence, the Cochise Residence). RODRIGUEZ-Lara thanked GARCIA-Gallegos and said he (RODRIGUEZ-Lara) would send the "woman" (JAIME) over "there" (RODRIGUEZ-Lara's residence) and he would tell "Silvita" (SANCHEZ-Zarate) to give "it" (narcotics) to "her" (JAIME).

78. At approximately 5:39 p.m., RODRIGUEZ-Lara, made an outgoing call to JAIME. During the call, RODRIGUEZ-Lara said that his damned wife (SANCHEZ-Zarate) was at the store and "Nati" (PEREZ) is washing her car. JAIME acknowledged and said "Silvia" (SANCHEZ-Zarate) said she was at the store. RODRIGUEZ-Lara asked JAIME if she (JAIME) had a ride (mode of transportation) that could take her (JAIME) to the house (RODRIGUEZ-Lara residence). JAIME said she needed to check it out and asked RODRIGUEZ-Lara what time his wife (SANCHEZ-Zarate) was coming home from the store. During the call, RODRIGUEZ-Lara told JAIME she needed to call "Silvia" (SANCHEZ-Zarate).

79. At approximately 5:42 p.m., agents observed GARCIA-Gallegos and a Unidentified Hispanic Male come out of the North Santa Fe Residence). Agents observed GARCIA-Gallegos enter the driver's door of the white Chevrolet Suburban and the UM get into the front passenger seat. GARCIA-Gallegos departed the residence in the white Chevrolet Suburban and agents followed him. At approximately 5:44 p.m., agents observed GARCIA-Gallegos arrive at the Cochise Residence. At approximately 5:45 p.m., agents observed the white Chevrolet Suburban driven by GARCIA-Gallegos depart the Cochise Residence and return to the North Santa Fe Residence.

80. At approximately 5:54 p.m., RODRIGUEZ-Lara received an incoming call from PEREZ. During the call PEREZ told RODRIGUEZ-Lara that "Martin" (GARCIA-Gallegos) took "that" [brought the narcotics to the Cochise Residence]. RODRIGUEZ-Lara acknowledged and instructed PEREZ to put the "stuff" (narcotics) in his (RODRIGUEZ-Lara's) bedroom. RODRIGUEZ-Lara told PEREZ that her (PEREZ's) mother (SANCHEZ-Zarate) was on her way for "that" (narcotics). PEREZ acknowledged.

81. At approximately 5:59 p.m., agents observed a black Acura MDX, driven by SANCHEZ-Zarate arrive at the North Santa Fe Residence. Agents also observed a Hispanic female, later identified as Silvia LARA (RODRIGUEZ-Lara's daughter) in the front passenger seat of the black Acura MDX. At approximately 6:02 p.m., agents observed the black Acura MDX occupied by SANCHEZ-Zarate and LARA depart the residence.

**Seizure of 4 Pounds of Methamphetamine and Arrest of PEREZ on August 21, 2012 in San Marcos, CA.**

82. Based upon a number of intercepted calls between between August 18 and August 21, 2012, involving RODRIGUEZ-Lara and MARCIAL, agents determined that MARCIAL and NIEVES had crossed a shipment of methamphetamine from Tijuana, Mexico to their residence in Spring Valley, California on August 21, 2012. Additionally, border crossing information confirmed that at August 20, 2012, at approximately 10:02 p.m., MARCIAL and NIEVES entered into the United States through the San Ysidro Port of Entry (POE) in the Honda CRV, CA 5GUD022. Based on the wiretap interceptions, agents further determined that on August 21, 2012, MARCIAL would be transporting the shipment of narcotics from

Spring Valley to the North County of San Diego in order to transfer the drugs to the possession of PEREZ.

83. On August 21, 2012 agents established surveillance at both the Concepcion Residence and the Cochise Residence. At approximately 5:40 p.m., agents conducting surveillance at the Cochise Residence observed two Hispanic females getting into a maroon colored Cadillac CTS sedan. The two females did not leave the residence until approximately 6:15 p.m., when agents observed the maroon colored Cadillac CTS depart the residence driven by PEREZ. Agents observed that one of the females was PEREZ. At approximately 6:15 p.m., agents observed MARCIAL exit the Concepcion Residence and get into a white Ford Expedition. Agents observed MARCIAL depart the residence in the white Ford Expedition, travel northbound on California Highway 125 and westbound on California Highway 94. At that point, agents lost sight of the white Ford Expedition.

84. On August 21, 2012, at approximately 6:35 p.m., RODRIGUEZ-Lara received a call from MARCIAL. During the call, RODRIGUEZ-Lara told MARCIAL to "come" (bring narcotics shipment) if he (MARCIAL) wanted because he (RODRIGUEZ-Lara) was "ready" (to receive drug shipment). MARCIAL stated he was just letting RODRIGUEZ-Lara know that he (MARCIAL) was going out tonight and he (MARCIAL) wanted to get "this errand" (drug delivery) "off his back" (completed). RODRIGUEZ-Lara said it was up to MARCIAL and if he (MARCIAL) had something to do that was fine. RODRIGUEZ-Lara stated his daughter (PEREZ) was ready to see MARCIAL. MARCIAL said he was on his way "up" (to North County San Diego). RODRIGUEZ-Lara acknowledged and said "they" (MARCIAL and PEREZ) would meet (conduct drug transfer). MARCIAL stated he (RODRIGUEZ-Lara) could deduct the "4" ($400 US) from

39

"there" (MARCIAL'S payment for courier services for crossing the drugs).

85. On August 21, 2012, at approximately 7:06 p.m., RODRIGUEZ-Lara made an outgoing call to PEREZ. During the call, RODRIGUEZ-Lara asked PEREZ if she (PEREZ) remembered that she (PEREZ) brought a "gallon of milk" (unit of methamphetamine) in the morning. RODRIGUEZ-Lara asked PEREZ where the "gallon of milk" was that she brought this morning. PEREZ asked RODRIGUEZ-Lara if "they" (RODRIGUEZ-Lara and associates) didn't get "it" (retrieve drugs). RODRIGUEZ-Lara stated no. PEREZ exclaimed, "I have had it all this time?" PEREZ expressed disbelief and asked RODRIGUEZ-Lara if "they" really didn't get "it" (narcotics). RODRIGUEZ-Lara stated no. PEREZ exclaimed "I have been driving like this?" PEREZ asked RODRIGUEZ-Lara what should she do. RODRIGUEZ-Lara said to take "it" with her and "put it away" (secure the narcotics at a stash location).

86. At approximately 7:20 p.m., agents observed the Cadillac CTS sedan arrive at the Shell Gas Station located at 3480 Del Lago Blvd, Escondido, California. Agents observed the Cadillac CTS sedan park next to the white Ford Expedition, driven by MARCIAL. Agents then observed MARCIAL get out of the white Ford Expedition carrying a box and observed PEREZ get out of the front driver's door of the Cadillac CTS. Agents observed PEREZ open the trunk to the Cadillac CTS and MARCIAL put the box into the trunk of the vehicle. Agents then observed MARCIAL get into the white Ford Expedition and depart the gas station. Agents then focused the attention of the surveillance on PEREZ and the unidentified female passenger. Agents observed PEREZ depart the gas station in the maroon Cadillac CTS and travel northbound on US Interstate 15 and eastbound on California Highway 78.

87. On August 21, 2012, at approximately 7:27 p.m., RODRIGUEZ-Lara made an outgoing call to MARCIAL. During the call RODRIGUEZ-Lara asked MARCIAL his location. MARCIAL said he (MARCIAL) was on his way home. RODRIGUEZ-Lara asked MARCIAL if he (MARCIAL) had "seen his daughter" (met with PEREZ and completed the drug transfer). MARCIAL stated he had given "them" (PEREZ and passenger) the "cars" (narcotics). RODRIGUEZ-Lara acknowledged and said he would call MARCIAL tomorrow to "see what there was to do" (coordination for another drug shipment).

88. Agents coordinated with the San Diego Sheriff's Department (SDSD) to conduct a traffic stop of the maroon Cadillac CTS, driven by PEREZ, and at approximately 7:50 p.m., SDSO deputies conducted a traffic stop of the maroon Cadillac CTS. At approximately 7:53 p.m., RODRIGUEZ-Lara, received a call PEREZ. During the call, PEREZ told RODRIGUEZ-Lara that she (PEREZ) got stopped by the police and asked where the registration to the car was. RODRIGUEZ-Lara said the registration was there.

89. During the traffic stop the SDSO Deputies identified the driver to be PEREZ and identified an adult female passenger. Additionally, a five year old and an 11 month old child were in car seats in the rear passenger seats of the vehicle. During a subsequent consent search of the vehicle, SDSO Deputies found approximately 3 pounds of methamphetamine in a box in the trunk of the vehicle. Additionally, SDSO Deputies located approximately one pound of methamphetamine in a diaper bag located in the rear floorboard where the minor children were seated. PEREZ was arrested under California Health and Safety (H&S) 11370.4 (B)(1) Possession of Methamphetamine over 1 kilogram, and H&S 11378, Possession of a controlled substance

for sale. PEREZ was also charged with Penal Code (PC) 273 A (A), Willful cruelty to a child without injury or death. But PEREZ was eventually released.

90. On August 21, 2012, at approximately 8:08 p.m., RODRIGUEZ-Lara, made an outgoing call to LARA. During the call, RODRIGUEZ-Lara told LARA to "clean the house" (clear drugs out), because "NATI" (PEREZ) had "problems" (was arrested by law enforcement). LARA asked what happened. RODRIGUEZ-Lara said "NATI" (PEREZ) might have "problems" (possibly be arrested by law enforcement), because she (PEREZ) didn't have a license and the "dumb ass" (PEREZ) got stopped. RODRIGUEZ-Lara told LARA that he wanted her to "clean the house." RODRIGUEZ-Lara told LARA to "clean the house real good" (clear all drugs from house) and take the "measures" (drug weight scales) from where he (RODRIGUEZ-Lara) had them.

91. On August 21, 2012, at approximately 8:15 p.m., RODRIGUEZ-Lara again called LARA and told LARA he needed her to "clean everything." RODRIGUEZ-Lara stated he wanted her (LARA) to clean his (RODRIGUEZ-Lara's) restroom because there was a "measurer" (drug weight scale) there (in the bathroom). LARA asked why she (PEREZ) got stopped (by police). RODRIGUEZ-Lara said she (PEREZ) got pulled over and she (PEREZ) doesn't have a license and he (RODRIGUEZ-Lara) doesn't know what is going to happen. RODRIGUEZ-Lara stated "Mother Fucker! I am a dumb ass because she wanted me to help her (bail out). LARA asked what happened and asked what she (PEREZ) didn't have on her (drugs in PEREZ's possession). RODRIGUEZ-Lara stated she (PEREZ) went to "pick up" (retrieve drug shipment). RODRIGUEZ-Lara asked LARA to clean the house (clean house of all drugs). LARA acknowledged. RODRIGUEZ-Lara told LARA to take the "manta" (drugs) that are on top

42

of the tire and take it to "Martin" (Felipe GARCIA-Gallegos) and tell him to put "it" (narcotics) in the trailer, please. LARA said she would do all that right now.

92. Based on the above mentioned intercepted calls between RODRIGUEZ-Lara and LARA, his daughter, agents confirmed RODRIGUEZ-Lara's awareness of the arrest of PEREZ and the seizure of the methamphetamine. Agents further determined there were additional quantities of drugs at RODRIGUEZ-Lara's residence and that RODRIGUEZ-Lara had instructed LARA to take the undetermined amount of drugs from the Cochise Residence to the North Santa Fe Residence.

93. Based on this information, agents established surveillance at the Cochise Residence and the North Santa Fe Residence. Agents then observed a black Ford F-250 truck depart Cochise Residence and travel to the North Santa Fe Residence. Agents also observed a white Chevrolet Suburban (previously seen driven by GARCIA-Gallegos) arrive at the North Santa Fe Residence. Within minutes, agents observed the black Ford F-250 depart the residence and travel east on Osborne Street. Agents maintained surveillance and followed the vehicle to the Pala Indian Casino on California Highway 76. Agents observed the driver of the black Ford F-250 to be a Hispanic female with blond hair and to be approximately 25-30 years of age. Agents also observed the front passenger to be LARA. Agents then observed SANCHEZ-Zarate come out of the casino and get into the rear passenger seat of the black Ford F-250. Later intercepted calls confirmed that LARA and the vehicle's driver had moved the narcotics from the Cochise Residence to the North Santa Fe Residence and then picked up SANCHEZ-Zarate.

94. Following the seizure, on August 26, 2012, at approximately 12:49 p.m., MARCIAL, made a call to NIEVES. During the call MARCIAL

43

asked NIEVES if he (MARCIAL) took his (MARCIAL'S) mom's car (white Ford Expedition) that day (of PEREZ' arrest) he took the "cars" (narcotics). NIEVES stated she believed he (MARCIAL) took the Honda (CRV). MARCIAL affirmed. MARCIAL stated "she" (PEREZ) had a clean record, so the lawyer was saying that "they" (law enforcement) were never supposed to have gotten "her" (PEREZ) down at anytime. MARCIAL said she (PEREZ) was pulled over on the "78" (California Highway 78). NIEVES stated that (Hwy 78) was almost by her (PEREZ's) "crib" (residence). MARCIAL acknowledged. MARCIAL stated she (PEREZ) was about to arrive (at residence), but they (law enforcement) kept getting behind her (PEREZ), swerving and all. MARCIAL said she (PEREZ) did not say anything about him (MARCIAL) or anything (drug related) though. NIEVES acknowledged. MARCIAL stated "Isidro" (RODRIGUEZ-Lara) asked if he (MARCIAL) wanted to keep on working. MARCIAL said he (MARCIAL) had asked if "she" (PEREZ) had said anything and he (RODRIGUEZ-Lara) said no. MARCIAL stated he (MARCIAL) could go over to "TJ" (Tijuana) twice or something just to "check" [to see if law enforcement stops him at the port of entry], just like "that" (with no narcotics). NIEVES stated she understood. NIEVES stated "they" (MARCIAL and NIEVES) can go with her (NIEVES') grandmother or something. MARCIAL acknowledged.

**August 24, 2012: Surveillance of RODRIGUEZ-Lara, AGUILAR, and JAIME and Drug Transfer from MARIN and LOPEZ to AGUILAR's Courier**

95. On August 23, 2012, at approximately 8:08 p.m., RODRIGUEZ-Lara, made an outgoing call to (413) 209-5158, subscribed to Jaime Sanchez, 3668 La Mirada Drive, San Marcos, CA (the La Mirada Residence), and used by David AGUILAR. During the call, RODRIGUEZ-Lara asked AGUILAR if he (AGUILAR) needed "something"

(narcotics) urgently. AGUILAR said yes and said he would see "someone" (another narcotics source of supply) if RODRIGUEZ-Lara was busy. RODRIGUEZ-Lara said the problem was he (RODRIGUEZ-Lara) was eager for "invoices" (money) because he (RODRIGUEZ-Lara) had to pay the attorney on Monday so the "case" (arrest/charges against PEREZ) could be started. RODRIGUEZ-Lara said he had to give at least half and the "eagle" (bail bondsman) was going to charge him "twenty" ($20,000). AGUILAR commented that RODRIGUEZ-Lara would have to move "papers" (narcotics proceeds) because it was tough. RODRIGUEZ-Lara said he would call a "person" (narcotics courier) to see if "they" (courier) could bring "that" (deliver narcotics to AGUILAR). AGUILAR affirmed. RODRIGUEZ-Lara said he would talk to the "person" (courier). AGUILAR said he would be waiting for RODRIGUEZ-Lara's call before he did "anything else" (contact another narcotics source of supply).

96. On August 23, 2012, at approximately 9:58 p.m., RODRIGUEZ-Lara received a call from JAIME. During the call, RODRIGUEZ-Lara asked JAIME if she (JAIME) had "done anything" (sold narcotics previously fronted to her by RODRIGUEZ-Lara). JAIME said no, that she was waiting on him (RODRIGUEZ-Lara to authorize the sale). RODRIGUEZ-Lara said "they" (AGUILAR) were asking him (RODRIGUEZ-Lara) for "one" (one pound of methamphetamine) and he (RODRIGUEZ-Lara) needed "it" (to sell the pound of methamphetamine) because the attorney was charging him (RODRIGUEZ-Lara) $20,000 (referring to legal fees surrounding PEREZ's 8/21/2012 drug arrest). JAIME said the "lady" (pending customer for JAIME) had not called her (JAIME) and she (JAIME) didn't want to get in more debt (drug debt for fronted drugs from RODRIGUEZ-Lara. JAIME said it doesn't benefit

45

RODRIGUEZ-Lara either (to front drugs when he needs cash to pay attorney fees). JAIME said she told RODRIGUEZ-Lara's wife (Silvia SANCHEZ-Zarate) that she (JAIME) didn't want to "kiss her (female customer of JAIME) ass" (beg the customer to purchase the drugs), because later "she" (female customer) would say that "she" (JAIME) was "blackmailing" (overcharging the price of drugs) her. JAIME said she knows how "she" (female customer) operates, so she (JAIME) was waiting to talk to "her" (female customer) this week. JAIME stated she (JAIME) has "it" (narcotics) "there" (at residence/stash location of JAIME).

97. On August 24, 2012, at approximately 9:38 a.m., RODRIGUEZ-Lara spoke with AGUILAR by phone. During the call, RODRIGUEZ-Lara informed AGUILAR that he (RODRIGUEZ-Lara) would be heading over that way, as he had to go check on the other car with the mechanic. RODRIGUEZ-Lara told AGUILAR he would call him (AGUILAR) once he was there so that AGUILAR could head over. AGUILAR acknowledged. RODRIGUEZ-Lara said "it" (meeting location) was around the McDonald's at a place called Fantasia Unidos. RODRIGUEZ-Lara said he would be there in a half-hour or so. AGUILAR acknowledged.

98. Based on the above wiretap interceptions, agents suspected that RODRIGUEZ-Lara and AGUILAR would meet to conduct a narcotics transaction. Agents suspected that RODRIGUEZ-Lara would have a courier bring the narcotics to AGUILAR at the meeting.

99. At approximately 11:03 a.m., agents located RODRIGUEZ-Lara at the Ye Old Car Shopee, 555 Mercantile Street, Vista, CA. Agents observed RODRIGUEZ-Lara meeting in front of the business with another unidentified male who appeared to be a mechanic. At approximately 11:03 a.m., RODRIGUEZ-LARA received a call from AGUILAR. During the

call, RODRIGUEZ-Lara asked AGUILAR if he (AGUILAR) wanted him (RODRIGUEZ-Lara) to meet him (AGUILAR) at Rancho Santa Fe (road in San Marcos, CA) where the "auto parts" (store) was. AGUILAR said that was fine. RODRIGUEZ-Lara said he was on his way.

100. At approximately 11:06 a.m., agents observed RODRIGUEZ-Lara depart the business, driving a silver BMW sedan. At approximately 11:15 p.m., agents observed RODRIGUEZ-Lara arrive and park at the Auto Zone car parts store, 195 Rancho Santa Fe Road, San Marcos, CA. Agents then observed a dark blue colored Toyota Camry, bearing CA license plate 4XLP174 and registered to Ricardo and Claudia SUAZO, 366 West San Marcos Blvd, San Marcos, CA arrive and park next to RODRIGUEZ-Lara's silver BMW. Agents observed JAIME get out of the blue Toyota Camry and also observed RODRIGUEZ-Lara get out of his vehicle. Agents observed both subjects engage in conversation.

101. At approximately 11:25 a.m., agents observed another silver BMW sedan park next to RODRIGUEZ-Lara's silver BMW sedan and the driver remained inside the vehicle. The second silver BMW had CA license plate 5XWM569, which is registered to Edgar BLANCO, 3827 Linda Vista Drive, San Marcos, CA.

102. At approximately 11:26 a.m., agents observed JAIME enter the dark blue Toyota Camry and depart the Auto Zone parking lot. Agents then observed RODRIGUEZ-Lara get into the front passenger seat of the second silver BMW sedan. Agents followed JAIME in the blue Toyota Camry and at approximately 11:40 a.m., agents observed her arrive at the Sycamore Ridge Apartment Complex, 820 Sycamore Avenue, Vista, CA. Agents observed JAIME park the blue Toyota Camry and enter an apartment building that houses apartments 229-249 (the location of the Sycamore Residence).

103. At approximately 11:42 a.m., RODRIGUEZ-Lara received a call from JAIME. During the call, JAIME asked RODRIGUEZ if he had called her. RODRIGUEZ-Lara asked JAIME if she could do him (RODRIGUEZ-Lara) a favor. JAIME said no problem. RODRIGUEZ-Lara said the "guy that came now" (referring to AGUILAR in the silver BMW) wanted to see the "car" (unit of methamphetamine) that she (JAIME) has (in her possession). RODRIGUEZ-Lara said he (AGUILAR) wanted to see if he (AGUILAR) could "buy it" (purchase methamphetamine). JAIME acknowledged. RODRIGUEZ-Lara said "from where they just met" (Auto Zone), one block up there is an auto parts and he (AGUILAR) wanted "them" (RODRIGUEZ-Lara and JAIME) to "meet" (conduct drug transaction) him (AGUILAR) there (auto parts store). RODRIGUEZ-Lara said he (AGUILAR) wanted to just take the "car" (methamphetamine) for him (AGUILAR) to see it. JAIME said yes, adding that she was "home" (at her residence/stash location) and "he" (RODRIGUEZ-Lara) could follow her from "there" (JAIME's residence/stash location). RODRIGUEZ-Lara said yes he would follow her. JAIME asked if only that "little car" (only one pound of methamphetamine). RODRIGUEZ-Lara said yes. JAIME asked if "he" (AGUILAR) would not want the "other cars" (other pounds of methamphetamine in her possession). RODRIGUEZ-Lara said no, just "one" (pound of methamphetamine). JAIME acknowledged and asked RODRIGUEZ-Lara to call her when he was downstairs (indicating she lived on the upstairs portion of a residence). RODRIGUEZ-Lara acknowledged and said he was on his way.

104. Agents maintained surveillance in the parking lot of the Sycamore Ridge Apartments and also conducted foot surveillance in the vicinity of the building that housed apartments 229-249.

1  105. At approximately 12:03 p.m., RODRIGUEZ-Lara received an
2 incoming call from JAIME. During the call JAIME asked RODRIGUEZ-Lara
3 where he was. RODRIGUEZ-Lara said he was about to arrive already.
4 JAIME asked if RODRIGUEZ-Lara was not going into the apartments yet.
5 RODRIGUEZ-Lara said no. JAIME said she was seeing some weird cars
6 (law enforcement surveillance) in the parking lot. JAIME said this
7 "guy" (unknown third party) said that he saw an "American guy"
8 (undercover law enforcement officer) "up there" (walking on embankment
9 by the apartment building), where she lived, with a cellular phone.
10 JAIME said she was parked in front of the apartment office and she
11 (JAIME) had not seen those cars (law enforcement surveillance
12 vehicles) there (in parking lot). JAIME said she was not sure what
13 was going on, as it was all very weird. RODRIGUEZ-Lara told JAIME to
14 come out with "that" (narcotics) and give "them" (narcotics) to him
15 (RODRIGUEZ-Lara) out "there" (in parking lot) in a bag. JAIME asked
16 where RODRIGUEZ-Lara was. RODRIGUEZ-Lara said he was about to arrive
17 already. JAIME told him to hold on and go to the ice cream parlor
18 that was outside. JAIME asked RODRIGUEZ-Lara if he wanted her to take
19 "both little cars" (two units of methamphetamine). RODRIGUEZ-Lara
20 said yes and told JAIME that if she saw anything "weird" (law
21 enforcement presence) was going on, then he (RODRIGUEZ-Lara) will take
22 "them" (narcotics). During the call, JAIME said yes she would rather
23 wait (to transport narcotics), as something really "weird" (law
24 enforcement presence) was going on. JAIME told RODRIGUEZ-Lara that he
25 (RODRIGUEZ-Lara) knew she wasn't afraid to do "it" (transport
26 narcotics), but it was "weird". JAIME told RODRIGUEZ-Lara to call her
27 in a bit.
28

106. At approximately 12:15 p.m., agents observed JAIME come from the building that housed units 229-249 again enter the blue Toyota Camry and begin to slowly drive through the apartment complex in a manner consistent with counter surveillance. At this point agents terminated surveillance.

107. At approximately 12:26 p.m., RODRIGUEZ-Lara made an outgoing call to JAIME. During the call, RODRIGUEZ-Lara told JAIME that he had a man, a "mechanic" (courier), who will do him the favor to go over to her (JAIME) house to get the "two cars" (two pounds of methamphetamine) for him (RODRIGUEZ-Lara). JAIME asked what car he (courier) had. RODRIGUEZ-Lara said a grey Toyota. JAIME said to have him (courier) head over (to the Sycamore Residence), so that she (JAIME) could give him (courier) the "cars" (narcotics). RODRIGUEZ-Lara acknowledged and said he (courier) was on his way over.

108. At approximately 5:46 p.m., RODRIGUEZ-Lara made an outgoing call to AGUILAR. During the call, AGUILAR asked RODRIGUEZ-Lara where were the "cars" (units of narcotics) located. RODRIGUEZ-Lara said if he (AGUILAR) got off a street before "Jordan" (referring to Nordahl Street in San Marcos, CA) there would be a light under the bridge. RODRIGUEZ-Lara said to keep going straight and there would be a junkyard where they do auctions. AGUILAR acknowledged. RODRIGUEZ-Lara said there would be an older guy walking there (at the junkyard/auction) and he (older guy) would give "it" (narcotics) to him (AGUILAR). RODRIGUEZ-Lara said he (older guy) could meet him (AGUILAR) in 20 minutes. AGUILAR said he is getting his brakes done right now. RODRIGUEZ-Lara asked for a call once AGUILAR was ready (to pick up narcotics), he (RODRIGUEZ-Lara) would call "her" (unidentified female). AGUILAR acknowledged.

50

109. At approximately 5:47 p.m., RODRIGUEZ-Lara made an outgoing call to (760) 622-2958, subscribed to Juan Marin, 4624 Maple Drive, Oceanside, CA (the Maple Residence), and used by Alicia Reyna MARIN. During the call RODRIGUEZ-Lara asked MARIN for a favor, if she (MARIN) could "take" (transport) "that" (2 pounds of methamphetamine) to the "guy" (AGUILAR) because he didn't have a car right now, because he was getting his brakes done and he (AGUILAR) couldn't go over there. MARIN asked "where" (should she deliver the narcotics). RODRIGUEZ-Lara said in Rancho Santa Fe. MARIN asked if at the same place. RODRIGUEZ-Lara said no, it was on Rancho Santa Fe and one more exit down. MARIN asked if from the freeway she would get off on Rancho Santa Fe. RODRIGUEZ-Lara said the left, pass the first light. MARIN asked if by the McDonald's. RODRIGUEZ-Lara affirmed and said further from McDonald's there was an auto parts place and "DON JOSE" (third party associated with MARIN and identified as LOPEZ) can see him (AGUILAR) there (auto parts store). MARIN said "they" (MARIN and LOPEZ) would leave in 10 minutes and RODRIGUEZ-Lara could call him (AGUILAR) so he can be there waiting. RODRIGUEZ-Lara thanked MARIN.

110. At approximately 5:56 p.m., RODRIGUEZ-Lara called AGUILAR who asked RODRIGUEZ-Lara what the "guy" (older male) had said. AGUILAR said his (AGUILAR's) "buddy" (AGUILAR's courier) had arrived at AGUILAR's location and he (the courier) could go "there" (to pick up narcotics at junkyard/auction). RODRIGUEZ-Lara acknowledged and asked what kind of car did he (AGUILAR's courier) have. AGUILAR said it was a small, brown Lincoln. RODRIGUEZ-Lara acknowledged and said he (RODRIGUEZ-Lara's courier) was an older guy, the one that was going to give "him" (AGUILAR's courier) the "key to the cars" (narcotics).

111. At approximately 6:34 p.m., RODRIGUEZ-Lara called AGUILAR and AGUILAR said "he" (AGUILAR's courier) said he was there but he didn't see anyone. During the call AGUILAR asked if "he" (RODRIGUEZ-Lara's courier) was American or Mexican. RODRIGUEZ-Lara said he (LOPEZ) was an older Mexican. RODRIGUEZ-Lara said he had dark skin, he was an older man, and he didn't have grey hair because he paints (dyes) it, but he's older. AGUILAR asked if he (LOPEZ) had a car or was he on foot. RODRIGUEZ-Lara said they (MARIN and LOPEZ) would be in a grey Toyota. AGUILAR acknowledged.

112. At approximately 6:35 p.m., RODRIGUEZ-Lara, made an outgoing call to MARIN. During the call RODRIGUEZ-Lara asked MARIN if he (LOPEZ) had "seen" (met with) "him" (AGUILAR's third party drug purchaser). MARIN said she had gone twice and had not seen "him" (AGUILAR's third party drug customer). RODRIGUEZ-Lara said the guy was there. MARIN said "JOSE" was coming and she was going to let "him" (JOSE) know where "he" (customer) was. In the background of the call, MARIN was heard yelling and saying "he's there, it's done". RODRIGUEZ-Lara asked MARIN if "it" (drug transaction) was done. MARIN said yes. RODRIGUEZ-Lara thanked MARIN. MARIN told RODRIGUEZ-Lara to let his "buddy" (AGUILAR) "know" (that the drug deal was completed) and they had to be "aware" (on the lookout for law enforcement). MARIN told RODRIGUEZ-Lara that he could count on her (MARIN) and told RODRIGUEZ-Lara not to get frustrated. RODRIGUEZ-Lara thanked her and said he appreciated that.

113. At approximately 6:39 p.m., RODRIGUEZ-Lara received a call from AGUILAR. During the call, AGUILAR asked RODRIGUEZ-Lara what "she" (MARIN) said. RODRIGUEZ-Lara said she said "yes, they had already seen the person" (met with AGUILAR's third party drug customer

and completed the drug transaction). RODRIGUEZ-Lara asked AGUILAR to confirm with the "person" (third party). AGUILAR acknowledged and told RODRIGUEZ-Lara he would call him (RODRIGUEZ-Lara) when he (AGUILAR) got the "papers" (drug proceeds). RODRIGUEZ-Lara acknowledged and thanked AGUILAR.

**September 1-2, 2012: Drug Transfer from MARCIAL to MARIN and LOPEZ**

114. On September 1, 2012, at approximately 11:32 a.m., RODRIGUEZ-Lara called MARCIAL. During the call RODRIGUEZ-Lara told MARCIAL that "3 cars" (three pounds of methamphetamine) would be "delivered" (from a source of supply) in the afternoon at around 3 or 4 pm. RODRIGUEZ-Lara told MARCIAL his (MARCIAL'S) "friend" (Tijuana stash house operator) would receive a phone call to tell him to open the "yard" (receive the drug shipment). MARCIAL acknowledged. RODRIGUEZ-Lara told MARCIAL to call when "he" (MARCIAL) "arrived" (crossed the drug shipment into the United States), because "they" (MARIN and LOPEZ) were kind of busy. MARCIAL acknowledged.

115. A number of additional calls around September 1, 2012, indicated that MARCIAL traveled down to Tijuana as anticipated and had picked up 3 pounds of methamphetamine for RODRIGUEZ-Lara. Border crossing information confirmed that on September 2, 2012 at approximately 1:25 a.m., MARCIAL, NIEVES, and a minor child, entered into the United States through the San Ysidro Port of Entry (POE) in the same Honda CRV, CA 5GUD022, as they had on previous occasions. Intercepted calls also indicated that on September 2, 2012, MARCIAL and RODRIGUEZ-Lara would make arrangements for MARCIAL to transfer the drugs to MARIN and LOPEZ at an unknown location.

116. On September 2, 2012 at approximately 8:56 a.m., RODRIGUEZ-Lara called MARCIAL. During the call MARCIAL asked

RODRIGUEZ-Lara if he (RODRIGUEZ-Lara) could come to the "junk yard" (Concepcion Residence) because he (MARCIAL) had an errand to run. MARCIAL said if not, he (MARCIAL) would take them (narcotics) "up there" (North County San Diego) in the "tow truck" (load vehicle). RODRIGUEZ-Lara asked MARCIAL if he (MARCIAL) could do him (RODRIGUEZ-Lara) the favor (take the narcotics north to RODRIGUEZ-Lara). RODRIGUEZ-Lara said there was a "lady" (MARIN). RODRIGUEZ-Lara told MARCIAL to come (transport the narcotics) and then he (RODRIGUEZ-Lara) would call the "lady" (MARIN). MARCIAL acknowledged.

117. At approximately 10:05 a.m., RODRIGUEZ-Lara made a call to MARCIAL. During the call, RODRIGUEZ-Lara told MARCIAL "it" (drug transfer location) was four miles north of their usual meeting place at the lake. RODRIGUEZ-Lara added it was off the first exit off the 78 (Nordahl Road). RODRIGUEZ-Lara said a friend (associate), an old man (LOPEZ) lives there in a trailer and "he" (LOPEZ) will do him (RODRIGUEZ-Lara) a "favor" (receive drug shipment from MARCIAL). RODRIGUEZ-Lara asked if MARCIAL knew where the vehicle auction in Escondido (California) was (Road One Car Auction, 2444 Barham Drive, Escondido, CA). RODRIGUEZ-Lara said one can see it off the freeway (CA Highway 78). MARCIAL said yes. RODRIGUEZ-Lara said MARCIAL can meet "him" (LOPEZ) there since he (LOPEZ) only lives about half a block from there (car auction) to avoid problems (with law enforcement).

118. At approximately 10:11 a.m., RODRIGUEZ-Lara made a call to LOPEZ. During the call, RODRIGUEZ-Lara told LOPEZ he (RODRIGUEZ-Lara) needed to ask LOPEZ to do an "errand" (drug pickup) for him (RODRIGUEZ-Lara). RODRIGUEZ-Lara said the "guy" (MARCIAL) that brings

the "cars" (methamphetamine) is coming. RODRIGUEZ-Lara asked LOPEZ if he would be able to "pick them up" (receive the drug shipment from MARCIAL). RODRIGUEZ-Lara stated he told "him" (MARCIAL) to go over "there" (car auction) by where LOPEZ lives, so LOPEZ could pick "them" (narcotics) up and "keep them" (safeguard at LOPEZ's residence) for him (RODRIGUEZ-Lara). LOPEZ asked RODRIGUEZ-Lara where did RODRIGUEZ-Lara want him (LOPEZ) to pick "them" (narcotics) up. RODRIGUEZ-Lara said he (MARCIAL) would go see LOPEZ at the car auction. LOPEZ asked at what time. RODRIGUEZ-Lara said in like an hour.

119. At approximately 10:17 a.m., RODRIGUEZ-Lara received a call from MARIN. During the call, MARIN asked RODRIGUEZ-Lara what happened. RODRIGUEZ-Lara said the "guy" (MARCIAL) would be bringing him (RODRIGUEZ-Lara) "two vehicles" (two pounds of methamphetamine). MARIN asked where (would the transfer take place). RODRIGUEZ-Lara said "he" (MARCIAL) is going to go see "him" (LOPEZ) at the car auction, half a block from "his" (LOPEZ's) house. MARIN acknowledged and said to call her from the other number and added that she was going to go to LOPEZ's house now. RODRIGUEZ-Lara acknowledged.

120. At approximately 1:09 p.m., RODRIGUEZ-Lara received a call from MARCIAL. During the call, MARCIAL asked RODRIGUEZ-Lara if "it" (drug transfer location) was where the trailer park was. RODRIGUEZ-Lara said "it" (car auction) was in front of the trailer park. RODRIGUEZ-Lara said the "tow truck" (LOPEZ's load vehicle) was there, and added in two minutes they (LOPEZ and MARIN) would be arriving in a white, Ford pickup truck. MARCIAL acknowledged. RODRIGUEZ-Lara said it was for "them" (LOPEZ and MARIN) to follow MARCIAL so they would not be out there in the street; it was safer for

55

everybody. MARCIAL asked if "it" (LOPEZ's vehicle) was a white pickup. RODRIGUEZ-Lara affirmed. MARCIAL said he (MARCIAL) saw "one" (white pickup truck) that came out of the trailer park, but he kept going straight. RODRIGUEZ-Lara said "they" (LOPEZ and MARIN) were around there.

121. At approximately 1:19 p.m., RODRIGUEZ-Lara received a call from MARCIAL. During the call, MARCIAL said he (MARCIAL) already "left the cars" (transferred narcotics) to "him" (LOPEZ). RODRIGUEZ-Lara thanked MARCIAL and said "there" (LOPEZ's residence in the trailer park) is where MARCIAL is going to see "him" (LOPEZ) often, there (residence/stash location) is where "he" (LOPEZ) lives. MARCIAL acknowledged.

**September 6, 2012: Identification of Jose Luis LOPEZ and Alica Reyna MARIN and the LOPEZ residence/stash location, 1145 Barham Drive, Unit 4, San Marcos, CA.**

122. Based on the above interceptions around September 1-2, 2012, agents determined that LOPEZ and MARIN were being utilized by RODRIGUEZ-Lara to receive the drug shipments from MARCIAL and safeguard the narcotics at LOPEZ's residence, the Barham Residence, in the vicinity of Road One Car Auction (2444 Barham Drive, Escondido, CA). The phone utilized by LOPEZ, and intercepted on September 2, 2012, is subscribed to Jose LOPEZ, 1324 Maryland Drive, Vista, CA. An open source database search of 1324 Maryland Drive, Vista, CA revealed a Jose LOPEZ with a social security number which matched a Jose Luis LOPEZ, with a California Driver's Licence listing a current address of 1145 Barham Drive, Apartment #4, San Marcos, CA (the Barham Residence). This address is approximately 1 block west of Road One Auto Auctions, 2444 Barham Drive, San Marcos, CA.

123. On September 6, 2012, agents conducted surveillance of 1145 Barham Drive, Trailer Unit #4, San Marcos, CA. During the surveillance, agents observed a white Ford F-150 pickup truck parked in the driveway of the trailer residence. A CA DMV records check indicated the registered owner of the vehicle to be Alicia Marin, 4624 Maple Drive, Oceanside, CA (the Maple Residence). The phone utilized by MARIN in intercepted calls is subscribed to Juan Marin, 4624 Maple Drive, Oceanside, CA (the Maple Residence). Furthermore, law enforcement database checks confirm that Alicia Reyna MARIN has a CA driver license which lists a current residence of 4624 Maple Drive, Oceanside, CA (the Maple Residence).

**October 11, 2012: Surveillance of 820 Sycamore Avenue, Vista, CA and identification of JAIME**

124. On October 11, 2012 agents established surveillance at the Sycamore Ridge Apartments, 820 Sycamore Avenue, Vista, CA, specifically focusing the surveillance on a blue Toyota Camry, CA 4XLP174 and with the goal of identifying JAIME and her exact address. Agents observed the blue Toyota Camry arrive at the Sycamore Ridge Apartment Complex. The vehicle was observed to be occupied by two Hispanic females, the driver matching the description of the person previously seen driving the Toyota Camry and meeting with RODRIGUEZ-Lara on August 24, 2012. Agents observed the vehicle park in the vicinity of the car port next to the apartment building bearing the numbers "229-244" on the exterior of the building. Agents later observed the blue Toyota Camry depart the car port, occupied by the female matching the description of JAIME as well as another unidentified Hispanic female and an unidentified Hispanic male. Agents maintained surveillance and coordinated a vehicle stop by the

1 San Diego Sheriff's Department (SDSD).  During the traffic stop, the
2 SDSD Deputy identified JAMIE as Alma JAIME.  Additionally, the SDSD
3 Deputy identified a teenage minor child, the son of JAIME, seated in
4 the rear passenger seat.  During the SDSD Deputy's contact with JAIME,
5 JAIME could not produce a photo identification, but did produce a
6 Women, Infant and Children (WIC) card in the name of Alma JAIME.

7     125. Further investigation into Alma JAIME showed that on March
8 21, 2012, JAIME's minor child was arrested at 125 Vallecitos De Oro,
9 San Marcos for California Health and Safety (H&S) Code 11357 (B) -
10 possession of up to an ounce of marijuana.  The minor child was
11 released to the custody of the child's mother, Alma JAIME, at 820
12 Sycamore Avenue, #238, Vista, CA (the Sycamore Residence).
13 Additionally, JAIME provided SDSD Deputies the following two telephone
14 numbers as contact information:  (760) 458-4592 and (760) 331-4351.
15 (760) 331-4351 has been intercepted on numerous occasions being used
16 by JAIME during the court-authorized wiretaps.

17
18 **October 31, 2012:  Surveillance of 3668 La Mirada Drive, San Marcos, CA and identification of David AGUILAR:**

19     126. On October 31, 2012, at approximately 7:30 a.m., agents
20 conducted surveillance of the La  Mirada Residence to identify the
21 subjects residing at the residence.  Agents observed a grey Chevrolet
22 Tahoe, bearing CA license plate 4MFY047, registered to David AGUILAR,
23 3668 La Mirada Drive, San Marcos, CA, (La Mirada Residence) parked in
24 the driveway of the residence.

25     127. Later that day, at approximately 8:47 p.m., agents observed
26 the garage door of the residence open.  Agents observed a red Mercedes
27 sedan (CA 5NGZ041), a silver BMW sedan (CA 5XWM569) and an orange GMC
28 pickup truck (CA 7E36784, registered to David AGUILAR, 3668 La Mirada

1 Drive, San Marcos, CA) (La Mirada Residence) parked in the garage of
2 the residence. Agents then observed a Hispanic male, approximately
3 5'10" inches, 200 pounds with short black hair and a goatee exit the
4 garage. Agents positively identified to be the individual to be David
5 AGUILAR, the individual involved in previous drug transactions with
6 RODRIGUEZ-Lara, and matched his physical description to a California
7 driver license in that name.

**November 8, 2012: Surveillance of 546 Stewart Drive, Vista, CA and 4624 Maple Drive, Oceanside, CA**

10    128. On November 8, 2012, agents conducted surveillance at 546
11 Stewart Drive, Vista, CA (the Stewart Residence), the residence of
12 Nancy BLANCAS-Pena. During the surveillance agents observed a black
13 Audi sedan, bearing CA license plate 6ULR323 parked in the driveway of
14 the residence. A search of the California Department of Motor
15 Vehicles (CA DMV) records revealed that the black 2002 Audi sedan (CA
16 6ULR323) is registered to Nancy BLANCAS at 546 Stewart Drive, Vista,
17 CA.

18    129. On this same date, agents also conducted surveillance at
19 4624 Maple Drive, Oceanside, CA (the Maple Residence), the suspected
20 residence of Alicia Reyna MARIN. During the surveillance agents
21 observed a white Ford F-150 pickup truck parked in the driveway of the
22 residence, bearing CA license plate 6J54880, which is registered to
23 Alicia Reyna MARIN at 4624 Maple Drive, Oceanside, CA (the Maple
24 Residence). Agents observed LOPEZ sitting in the front passenger seat
25 of MARIN's white Ford F-150 pickup truck. Agents also observed a
26 maroon Ford Ranger pickup truck, bearing CA license plate 5F90462
27 parked in the driveway next to the white Ford F-150. A CA DMV records

59

check indicated the 1995 maroon Ford Ranger is registered to Raul MARIN-Torres, 4624 Maple Drive, Oceanside, CA.

**Transportation of Drug Proceeds by GARCIA-Gallegos on November 27, 2012**

130. Based on intercepted calls involving RODRIGUEZ-Lara and GARCIA-Gallegos, agents determined that on November 27, 2012, GARCIA-Gallegos would be transporting an undetermined amount of drug proceeds from Vista, California, to Tijuana, Mexico. Agents established surveillance at the North Santa Fe Residence. Agents followed GARCIA-Gallegos in his vehicle to the vicinity of RODRIGUEZ-Lara's residence, the Cochise Residence, where GARCIA-Gallegos remained for approximately 10 minutes. Although agents did not directly observe RODRIGUEZ-Lara's residence, it is believed, based on intercepted calls below, that GARCIA-Gallegos picked up drug proceeds at that location. Agents then observed GARCIA-Gallegos drive away from RODRIGUEZ-Lara's residence and return to his residence where he loaded a car seat, a large plastic bag and other unidentified items into his vehicle. Further interceptions indicated that GARCIA-Gallegos would travel to Alma JAIME's residence to retrieve more drug proceeds prior to traveling to Tijuana, Mexico. Agents then observed GARCIA-Gallegos depart his residence and eventually drive to the Sycamore Residence. Approximately ten minutes later agents observed GARCIA-Gallegos depart the apartment complex and head eastbound on Highway 78 and southbound on Interstate 15. Agents coordinated a traffic stop with the San Diego Sheriff's Department, but no drug proceeds were found within the vehicle. However, a subsequent intercepted call between RODRIGUEZ-Lara and GARCIA-Gallegos indicated that law enforcement did not find

the drug proceeds that were concealed in the vehicle. Detailed below are the intercepted calls which support this belief.

131. On November 27, 2012, at approximately 10:20 a.m., RODRIGUEZ-Lara made a call to a Mexico-based narcotics supplier. During the call, RODRIGUEZ-Lara discussed with the supplier the amount of narcotics that he had sold and drug proceeds that he was going to send to the supplier. RODRIGUEZ-Lara stated he was going to "send 12" [$12,000 in drug proceeds] for the "2 cars" [two units of drugs] and "1-2" [$1,200 in drug proceeds] that was pending from "1 car" [1 unit of drugs]. The supplier asked RODRIGUEZ-Lara if he (RODRIGUEZ-Lara) would be sending "Martin" (GARCIA-Gallegos) that day, otherwise he (the supplier) was "sending someone" [would dispatch a courier from Tijuana, Mexico to meet with and retrieve drug proceeds from RODRIGUEZ-Lara], because he (the supplier) really "needed" [needed the drug proceeds]. RODRIGUEZ-Lara said "he" (GARCIA-Gallegos) would "go over there" [travel with drug proceeds from Vista, California to Tijuana, Mexico] in about an hour.

132. On November 27, 2012, at approximately 12:40 p.m., RODRIGUEZ-Lara, received a call from GARCIA-Gallegos. During the call, GARCIA-Gallegos asked RODRIGUEZ-Lara if "La Dona" [Alma JAIME] had answered. RODRIGUEZ-Lara said yes and that "she" (JAIME) was almost ready [to turn over additional drug proceeds to GARCIA-Gallegos] and she (JAIME) would call him (GARCIA-Gallegos).

133. On November 27, 2012, at approximately 3:49 p.m., RODRIGUEZ-Lara made a call to GARCIA-Gallegos, after GARCIA-Gallegos was stopped by the San Diego Sheriff's Department, as is detailed above. During the call GARCIA-Gallegos told RODRIGUEZ-Lara "they" (RODRIGUEZ-Lara and his criminal associates) needed to "clean the kids over there"

[remove drugs from GARCIA-Gallegos' residence, the North Santa Fe Residence]. RODRIGUEZ-Lara acknowledged and said he was going to "send someone over to clean" [RODRIGUEZ-Lara would dispatch a criminal associate to go to the North Santa Fe Residence to remove the drugs]. GARCIA-Gallegos stated he was going to call his (GARCIA-Gallegos's) cousin, because there were "two" [two units of drugs], "two cars" [two units of drugs] in "his" (cousin's) room and "they" (RODRIGUEZ-Lara and criminal associates) had to "move them from there" [remove the drugs from the North Santa Fe Residence]. RODRIGUEZ-Lara agreed and said that GARCIA-Gallegos should call "him" (his cousin) so somebody could go "pick them up" [remove the drugs].

134. On November 27, 2012, at approximately 3:55 p.m., RODRIGUEZ-Lara received a call from GARCIA-Gallegos. During the call RODRIGUEZ-Lara asked GARCIA-Gallegos to tell his (GARCIA-Gallegos's) cousin that "Don Chepe" [LOPEZ] was going to come over [to the North Santa Fe Residence] and "drop off the truck" [pick up the drugs]. GARCIA-Gallegos stated he (GARCIA-Gallegos) was "let go" [released from law enforcement detention], but GARCIA-Gallegos believed "the lady" [JAIME] had a "tail" [GARCIA-Gallegos believed the reason he was stopped by law enforcement was because of his meeting with JAIME to pick up the drug proceeds]. GARCIA-Gallegos stated "they" (law enforcement) "checked everything" [searched his vehicle thoroughly]. GARCIA-Gallegos stated the good thing was that he hid the money [drug proceeds] pretty well, otherwise everything would have gone to hell. GARCIA-Gallegos stated "they" (law enforcement) got the "dog" [law enforcement canine] in the car and checked the truck five times. GARCIA-Gallegos said luckily "they" (law enforcement) didn't find that "shit" [drug proceeds] otherwise everything would have gone to hell.

GARCIA-Gallegos said "it" [the traffic stop] happened as soon as he got out of the "78" (CA Highway 78), while he was on his way up to the "lake" [Shell gas station located at Del Lago Blvd]. During the call, GARCIA-Gallegos stated every time "they" (law enforcement) "got close" [near the location where the drug proceeds were hidden in the vehicle], he was afraid "they" (law enforcement) were going to "pull it up" [open the hidden compartment where the money was hidden], but "they" (law enforcement) didn't. RODRIGUEZ-Lara asked GARCIA-Gallegos if they should "move the car" [move the drugs from the North Santa Fe Residence] or not. GARCIA-Gallegos said they had to wait until his (GARCIA-Gallegos's) cousin got home, but they did have to move "them" [drugs], because "they" (law enforcement) took his (GARCIA-Gallegos's) address and a photograph of him. GARCIA-Gallegos added they should do "it" [move the drugs from the North Santa Fe Residence], but his cousin was going to arrive [at the North Santa Fe Residence] around 4:30 (PM). RODRIGUEZ-Lara said alright.

135. On November 27, 2012 at approximately 4:18 p.m., RODRIGUEZ-Lara made a call to GARCIA-Gallegos. During the call, GARCIA-Gallegos asked RODRIGUEZ-Lara if he (RODRIGUEZ-Lara) was going to give the "old man" [LOPEZ] the key [to the North Santa Fe Residence], so he (LOPEZ) would "take out the stuff from the trailer" [remove the drugs from a travel trailer parked at the North Santa Fe Residence]. RODRIGUEZ-Lara stated he already called "him" (LOPEZ) and he (LOPEZ) was already on his way over "there" (the North Santa Fe Residence), but there was not anyone there. GARCIA-Gallegos stated his (GARCIA-Gallegos's) mother was there, but his cousin would arrive around 4:30 (PM). RODRIGUEZ-Lara told GARCIA-Gallegos to have him (GARCIA-Gallegos's cousin) call him (GARCIA-Gallegos) as soon as "he" (GARCIA-Gallegos's

cousin) got "there" (the North Santa Fe Residence). RODRIGUEZ-Lara

stated he wanted to make arrangements with "him" (GARCIA-Gallegos's

cousin) so he (GARCIA-Gallegos's cousin) would meet with the "old man"

(LOPEZ).

**January 24, 2013, Drug Transfer at the Barham Residence Including
BERNAL, LOPEZ, GARCIA-Gaytan, and Subsequent Transfer to YASSO in
Escondido**

136. On January 24, 2013, intercepted calls involving RODRIGUEZ-

Lara, AGUILAR, LOPEZ, and others indicated that a suspected drug

transaction involving LOPEZ would occur at the Barham Residence.

Based on intercepted calls, Agents conducted surveillance at the

Barham residence. Detailed below are the intercepted calls and

surveillance which support this belief.

137. On January 24, 2013 at approximately 9:26 a.m., in a call

between RODRIGUEZ-Lara and AGUILAR, AGUILAR asked RODRIGUEZ-Lara "what

was going on" [status regarding pending drug transaction]. During the

call, AGUILAR stated that "the guy that was coming for the part was

with his wife, but the wife was feeling ill and wanted to head back"

[AGUILAR's drug customer who was to pick up drugs was with his wife

who felt sick and they were going to return].

138. At approximately 9:33 a.m., RODRIGUEZ-Lara called AGUILAR

and informed him that the "guy" [drug courier bringing drugs to the

Barham Residence] was on his way and said "they" (RODRIGUEZ-Lara et

al.) had already spoken "him" (drug courier). RODRIGUEZ-Lara also

indicated that the drug courier had gotten lost.

139. At approximately 10:16 a.m., in a call between RODRIGUEZ-

Lara and LOPEZ, RODRIGUEZ-Lara indicated that the suspected load

vehicle that would be delivering drugs to the Barham Residence was a

"blue" vehicle and that the driver was going to exit the freeway soon.

140. At approximately 10:20 a.m., agents observed a blue Mustang bearing CA license 5SWK402, registered to Hernan Sebastian BERNAL, 8767 Flagstone Avenue, Riverside, CA, driving westbound on Barham Drive, enter the mobile home park and drive toward space 4. Agents observed a Hispanic male, matching the description of Hernan Sebastian BERNAL, driving the blue Mustang. The blue Mustang was observed pulling away from a location near where MARIN's F-150 was parked at the Barham Residence. The blue Mustang departed the mobile home park at approximately 10:23 a.m., but agents did not follow the blue Mustang and continued to focus their attention on the Barham Residence.

141. At approximately 10:26 a.m., RODRIGUEZ-Lara called LOPEZ, and LOPEZ said that "everything was done" [the drug courier had delivered the drugs to the Barham Residence]. During that same call, RODRIGUEZ-Lara directed LOPEZ to "leave 2 outside and he (RODRIGUEZ-Lara) would stop by to get them" [LOPEZ was to leave 2 pounds of drugs outside the Barham Residence and RODRIGUEZ-Lara would pick up the drugs].

142. Approximately one minute later, at 10:27 a.m., RODRIGUEZ-Lara called AGUILAR and informed him that "the guy already arrived" [drug courier delivered drugs to LOPEZ at Barham Residence]. During that same call, RODRIGUEZ-Lara asked AGUILAR if he or his associate could go to the Barham Residence to pick up the drugs. AGUILAR responded that "the guy" [drug customer] would be heading "back up" [returning north] and that AGUILAR needed to find out if the drug customer still wanted the drugs.

143. At approximately 10:35 a.m., AGUILAR called RODRIGUEZ-Lara and asked RODRIGUEZ-LARA if he wanted "his buddy" [AGUILAR's

associate] to go pick up "the car" [drugs]. RODRIGUEZ-Lara replied "however you want it." During the same call, AGUILAR told RODRIGUEZ-Lara that his associate would do the pick up and would be driving a "dirt colored Lincoln" [brown Lincoln].

144. At approximately 10:39 a.m., RODRIGUEZ-Lara called LOPEZ and told LOPEZ that he was "on the street" [arrived near the Barham residence]. RODRIGUEZ-Lara asked LOPEZ to come outside and talk. LOPEZ agreed. RODRIGUEZ-Lara also told LOPEZ to "bring the 2 pieces" [bring the drugs].

145. At approximately that same time on January 24, 2013, agents observed RODRIGUEZ-Lara driving his black Ford F-250 and appeared to be entering the mobile home park at the Barham Residence, but just before driving through the entrance to the mobile home park, he abruptly turned back onto Barham Drive and drove away from the mobile home park.

146. At approximately 10:40 a.m., RODRIGUEZ-Lara called LOPEZ and directed him not to come out. Approximately one minute later at 10:41 a.m., RODRIGUEZ-Lara called AGUILAR who indicated that he had seen RODRIGUEZ-Lara driving a black truck and AGUILAR was behind him in a red car. RODRIGUEZ-Lara informed AGUILAR that RODRIGUEZ-Lara had seen "two suspicious cars" [law enforcement] "outside the man's" [outside LOPEZ's Barham Residence]. During that same call, RODRIGUEZ-Lara directed AGUILAR to tell "his buddy" [AGUILAR's associate] "to go into the first entrance to the left" [directions to the Barham Residence].

147. At approximately 10:44 a.m., RODRIGUEZ-Lara called LOPEZ and informed him that "a guy with a brown car was going to go to him" [AGUILAR's associate driving a brown car would arrive to pick up the drugs from LOPEZ].

148. At approximately 10:45 a.m., RODRIGUEZ-Lara called AGUILAR and informed him that there was "white truck, Ford F-150." RODRIGUEZ-Lara also told AGUILAR "it's the same guy sitting in the Ford F-150 who is going to deliver the key" [LOPEZ was waiting in the Ford F-150 outside the Barham Residence for AGUILAR's associate to deliver the drugs]. Agents conducting surveillance at the Barham Residence then observed LOPEZ sitting in the front passenger seat of MARIN's Ford F-150 parked in the carport.

149. On January 24, 2013, at approximately 10:54 a.m., agents observed a brown Lincoln sedan (California license 4TPC207[1/], registered to Hermelinda CRUZ, 150 South Rancho Santa Fe Rd, Space 72, San Marcos, CA) driven by a Hispanic male with a shaved head, later identified based on CA DMV photographs and vehicle records check as Leonard Rafael GARCIA-Gaytan enter the mobile home park, drive around the mobile home park where the Barham Residence is located, and exit the mobile home park.

150. At approximately 10:59 a.m., agents observed LOPEZ emerge from the Barham Residence with a white package in his hand and walk toward Barham Drive and he appeared to be looking for someone. At some point, agents lost sight of LOPEZ.

151. At approximately 11:02 a.m., RODRIGUEZ-Lara called LOPEZ and directed him to go outside because "the guy was going in circles" [AGUILAR's associate who was to pick up the drugs was lost trying to find the Barham Residence]. LOPEZ indicated that he "saw him go in"

---

[1/] Law enforcement database checks indicate that Leonardo Rafael Garcia, aka GARCIA-GAYTAN, with CA driver license D7238928, was previously arrested in this vehicle on November 16, 2012. GARCIA-Gaytan has subsequently been arrested in San Marcos, California on February 1, 2013, for possession of methamphetamine, while in the same Brown Lincoln.

1  [LOPEZ indicated that he saw AGUILAR's drug associate enter the mobile
2  home park].   LOPEZ asked RODRIGUEZ-Lara if it is "a brown car" [if
3  AGUILAR's associate was driving a brown car]. RODRIGUEZ-Lara stated
4  "yes."  LOPEZ also stated it came in, but he did not think it would
5  come back.

6       152. Approximately two minutes later at11:04 a.m., RODRIGUEZ-Lara
7  called AGUILAR and instructed AGUILAR to have his associate return to
8  the Barham Residence to meet LOPEZ.   At approximately 11:09 a.m.,
9  agents observed the brown Lincoln, CA license 4TPC207, again driven by
10 GARCIA-Gaytan, enter the mobile home park and later leave the mobile
11 home park.   Agents focused and maintained continuous surveillance on
12 the brown Lincoln.

13      153. At approximately 11:14 a.m., RODRIGUEZ-Lara called LOPEZ and
14 LOPEZ informed that "it's done" [drug transaction had been completed].

15      154. Agents proceeded to follow the brown Lincoln, which drove
16 eastbound on Barham Drive, and took 78 east.   Agents continued to
17 follow the brown Lincoln to a shopping center parking lot in
18 Escondido, and it headed toward the Jack in the Box restaurant at 1050
19 W. El Norte Parkway, Escondido.   Agents observed the brown Lincoln
20 park next to a white Cadillac sedan bearing Nevada license 888KSJ,
21 which is registered to Nathan K. YASSO, at 1876 Mesquite Canyon Dr,
22 Henderson, NV.   Agents observed a Hispanic male, later identified as
23 GARCIA-Gaytan, exit the Lincoln carrying a red gift bag with white
24 accents.   An older male, later identified as YASSO, exited the
25 driver's door of the Cadillac and made contact with GARCIA.   YASSO got
26 back into the driver's seat of the Cadillac and GARCIA, who was still
27 carrying the red gift bag, entered the rear driver's side of the
28

1 Cadillac. After less than a minute, GARCIA returned without the red
2 gift bag to the Lincoln.

3     155. Agents next focused surveillance on the white Cadillac,
4 which departed the shopping center at approximately 11:36 a.m. and
5 proceeded north on I-15. At some point, agents coordinated a traffic
6 stop with San Diego Sheriff's Department (SDSD). At approximately
7 11:40 a.m., a SDSD Deputy conducted a traffic stop. During the stop,
8 the Deputy identified the driver as YASSO and the female passenger as
9 Connie Cynthia Yasso. The Deputy requested a narcotics detector dog.
10 YASSO provided consent to search the vehicle. As the dog approached
11 vehicle, but prior to the search, YASSO confessed to having
12 methamphetamine in the back in a Christmas bag. The canine officer
13 found a red paper bag, a Christmas gift bag, which inside contained a
14 Neutrogena box, which held approximately 1 kilogram (over 2 pounds) of
15 methamphetamine.

16
**Recent Surveillance of Subject Premises (Previously described at ¶ 13**
17 **a-f)**

18     156. On January 30, 2013, agents conducted surveillance at
19 associated residences related to this organization. At approximately
20 11:25 am, agents arrived at La Mirada Residence (David AGUILAR's
21 residence). Agents observed a grey BMW sedan, bearing CA license
22 plate 5XWM569. This vehicle was previously seen on surveillance on
23 August 24, 2012, driven by AGUILAR during a meeting with
24 RODRIGUEZ-Lara and JAIME.

25     157. At approximately 12:51 pm, agents arrived at the Maple
26 Residence (Alicia MARIN's residence) and observed a white Ford F-150
27 pickup truck, bearing CA license plate 6J54880, registered to Alicia
28

Reyna MARIN, 4624 Maple Drive, Oceanside, CA) parked in the driveway of the residence.

158. On this same date at approximately 1:30 p.m., based on intercepted calls between JAIME and RODRIGUEZ-Lara, agents determined that JAIME would be traveling to RODRIGUEZ-Lara's residence to meet and talk. At approximately 1:45 pm, agents arrived at the Cochise Residence (RODRIGUEZ-Lara's residence). Agents observed a white Nissan pickup truck parked in the driveway of the residence, bearing CA license plate 21274C1, registered to Jose Antonio Uitzil, 402 Mission Avenue, Apt. 12, Escondido, CA. At approximately 1:50 p.m., agents observed the white Nissan Frontier Pickup depart the vicinity of the Cochise Residence. Agents observed the driver of the vehicle to be JAIME and followed the vehicle directly to 820 Sycamore Avenue. Agents observed the vehicle park in the carport close to Apartment #238 (the Sycamore Residence). Between January 30, 2013 and February 5, 2013, agents conducted surveillance on at least 4 separate occasions and observed the white Nissan Frontier pickup parked in the carport close to 820 Sycamore Avenue, Apartment #238 (the Sycamore Residence).

159. On February 5, 2013, agents conducted surveillance at the Cochise Residence and observed a black Ford F-250, bearing CA license plate 8Y84184, registered to Jose I. Lara and/or Silvia Sanchez, 1118 Cochise Court, Vista, CA, parked on the street in front of the residence. Agents also observed a white Nomad house trailer parked in the driveway of the residence. This same trailer was previously observed parked at GARCIA-Gallegos previous residence at 2133 N Santa Fe, Vista, CA, and intercepted calls between RODRIGUEZ-Lara, GARCIA-Gallegos and LARA, described above in ¶¶ 91 and 135 indicate

70

1  the trailer is used to store narcotics. The intercepted calls further
2  indicate the trailer is owned by RODRIGUEZ-Lara.

3      160. Throughout the course of the investigation a stationary
4  surveillance camera directed at the Concepcion Residence has
5  consistently identified vehicles owned and operated by MARCIAL and
6  NIEVES present at the residence. Most recently, on the morning of
7  February 13, 2013, the Honda CRV used by MARCIAL and NIEVES to cross
8  drugs into the United States on multiple occasions was seen parked at
9  the residence.

10                                VI

11      **PROCEDURES FOR ELECTRONICALLY STORED INFORMATION**

12      161. With the approval of the Court in signing this warrant,
13  agents executing this search warrant will employ the following
14  procedures regarding computers and other electronic storage devices,
15  including electronic storage media, that may contain data subject to
16  seizure pursuant to this warrant:

17  Seizure and Retention of Instrumentalities

18          a. Based upon the foregoing, there is probable cause to
19  believe that any computers and other electronic storage devices
20  encountered during this search are instrumentalities of the enumerated
21  offenses because there is probable cause to believe that they may
22  contain contraband and fruits of crime as provided at Rule 41(c)(2),
23  Fed.R.Crim.P., or were used in committing crime as provided at Rule
24  41(c)(3). Consequently, the computers and any other electronic storage
25  devices are subject to seizure, retention and possible forfeiture and
26  destruction. Computers, other electronic storage devices and media
27  confirmed onsite to contain contraband, constitute fruits of crime or
28  to have been used to commit crime will not be returned but will be

                                71

imaged offsite and analyzed as provided beginning at subparagraph (c) below. The onsite confirmation may be provided by an owner or user of the computer or storage device or, if feasible, may be obtained by conducting a limited onsite forensic examination to determine if the subject media contains any contraband or otherwise is an instrumentality. Computers and other electronic storage devices and media that are not confirmed onsite as instrumentalities will be taken offsite for imaging and preliminary analysis in accordance with subparagraph (b) below.

b. The offsite imaging and preliminary analysis of computers, other electronic storage devices and media to confirm their status as instrumentalities will be conducted within forty five (45) days of seizure. Seized items confirmed to be instrumentalities will not be returned and will be further analyzed as provided below. If the preliminary analysis, by definition an incomplete or partial analysis, does not confirm that a seized item is an instrumentality, the original item will be returned promptly to its owner, absent an extension of time obtained from the owner or from the court. An image of the items will be retained and subjected to a complete forensic analysis, as provided below.

c. Computers and other electronic storage devices and media that are retained as instrumentalities will not be returned to its owner. The owner will be provided the name and address of a responsible official to whom the owner may apply in writing for return of specific data not otherwise subject to seizure for which the owner has a specific need. The identified official or other representative of the seizing agency will reply in writing. In the event that the owner's request is granted, arrangements will be made for a copy of

72

the requested data to be obtained by the owner. If the request is denied, the owner will be directed to Rule 41(g), Federal Rules of Criminal Procedure.

Identification and Extraction of Relevant Data

        d.   A forensic image is an exact physical copy of the hard drive or other media. After obtaining a forensic image, the data will be analyzed to identify and extract data subject to seizure pursuant to this warrant. Analysis of the data following the creation of the forensic image can be a highly technical process requiring specific expertise, equipment and software. There are literally thousands of different hardware items and software programs, and different versions of the same program, that can be commercially purchased, installed and custom-configured on a user's computer system. Computers are easily customized by their users. Even apparently identical computers in an office environment can be significantly different with respect to configuration, including permissions and access rights, passwords, data storage and security. It is not unusual for a computer forensic examiner to have to obtain specialized hardware or software, and train with it, in order to view and analyze imaged data.

        e.   Analyzing the contents of a computer or other electronic storage device, even without significant technical issues, can be very challenging. Searching by keywords, for example, often yields many thousands of hits, each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant hit does not end the review process. The computer may have stored information about the data at issue: who created it, when and how it was created or downloaded or copied, when was it last accessed, when was it last

modified, when was it last printed and when it was deleted. Sometimes it is possible to recover an entire document that never was saved to the hard drive if the document was printed. Moreover, certain file formats do not lend themselves to keyword searches. Keywords search text. Many common electronic mail, database and spreadsheet applications do not store data as searchable text. The data is saved in a proprietary non-text format. Documents printed by the computer, even if the document never was saved to the hard drive, are recoverable by forensic programs but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. Similarly, faxes sent to the computer are stored as graphic images and not as text. In addition, a particular relevant piece of data does not exist in a vacuum. To determine who created, modified, copied, downloaded, transferred, communicated about, deleted or printed the data requires a search of other events that occurred on the computer in the time periods surrounding activity regarding the relevant data. Information about which user had logged in, whether users share passwords, whether the computer was connected to other computers or networks, and whether the user accessed or used other programs or services in the time period surrounding events with the relevant data can help determine who was sitting at the keyboard.

f. It is often difficult or impossible to determine the identity of the person using the computer when incriminating data has been created, modified, accessed, deleted, printed, copied, uploaded or downloaded solely by reviewing the incriminating data. Computers generate substantial information about data and about users which generally is not visible to users. Computer-generated data, including

registry information, computer logs, user profiles and passwords, web-browsing history, cookies and application and operating system metadata, often provides evidence of who was using the computer at a relevant time. In addition, evidence such as electronic mail, chat sessions, photographs and videos, calendars and address books stored on the computer may identify the user at a particular, relevant time. The manner in which the user has structured and named files, run or accessed particular applications, and created or accessed other, non-incriminating files or documents, may serve to identify a particular user. For example, if an incriminating document is found on the computer but attribution is an issue, other documents or files created around that same time may provide circumstantial evidence of the identity of the user that created the incriminating document.

g. Analyzing data has become increasingly time-consuming as the volume of data stored on a typical computer system and available storage devices has become mind-boggling. For example, a single megabyte of storage space is roughly equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is roughly equivalent of 500,000 double-spaced pages of text. Computer hard drives are now being sold for personal computers capable of storing up to 2 terabytes (2,000 gigabytes) of data. And, this data may be stored in a variety of formats or encrypted (several new commercially available operating systems provide for automatic encryption of data upon shutdown of the computer). The sheer volume of data also has extended the time that it takes to analyze data. Running keyword searches takes longer and results in more hits that must be individually examined for relevance. And, once reviewed, relevant data leads to new keywords and new

1 avenues for identifying data subject to seizure pursuant to the
2 warrant.

3          h.    Based on the foregoing, identifying and extracting data
4 subject to seizure pursuant to this warrant may require a range of
5 data analysis techniques, including the use of hashing tools    to
6 identify evidence subject to seizure pursuant to this warrant, and to
7 exclude certain data from analysis, such as known operating system and
8 application files.  The identification and extraction process may take
9 weeks or months.  The personnel conducting the identification and
10 extraction of data will complete the analysis within one-hundred
11 twenty (120) days from the date of seizure pursuant to this warrant,
12 absent further application to this court.

13          i.    All forensic analysis of the imaged data will employ
14 search protocols directed exclusively to the identification and
15 extraction of data within the scope of this warrant.

16 Genuine Risks of Destruction of Data

17          j.    Based upon my experience and training, and the
18 experience and training of other agents with whom I have communicated,
19 electronically stored data can be permanently deleted or modified by
20 users possessing basic computer skills.   In this case, only if the
21 subject receives advance warning of the execution of this warrant,
22 will there be a genuine risk of destruction of evidence.

23                                   VII

24                              **CONCLUSION**

25     162. Based on the foregoing there is probable cause to believe
26 that the locations to be searched in Attachments A1-6, contain
27 fruits, instrumentalities, and evidence of a violation of 21 U.S.C.
28 §§ 841(a)(1), 846, 952, 960, and 963, and 18 U.S.C. § 1956(h).   In

                                    76

1  addition, I believe that there exists probable cause that the

2  defendants committed the offense of Conspiracy to Distribute

3  Controlled Substances, as charged in the criminal complaint.

4

5  _____
   Jeffrey A. Wight

6  Special Agent
   Drug Enforcement Administration

7

8  SUBSCRIBED and SWORN to before me
   on this 15th day of February 2013

9  _____
   HONORABLE DAVID H. BARTICK

10  UNITED STATES MAGISTRATE JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28